[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 3, 2004
THOMAS K. KAHN
CLERK

No. 03-11880

D.C. Docket No. 01-02547 CV-WTH

URSULA UNGARO-BENAGES, Judge,
as heir of Lili Berliner nee Orenstein,

Plaintiff-Appellant,

versus

DRESDNER BANK AG,
DEUTSCHE BANK AG,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

**(August 3, 2004)**

Before BIRCH, KRAVITCH and OAKES[*], Circuit Judges.

KRAVITCH, Circuit Judge:

Plaintiff-appellant, Ursula Ungaro-Benages, filed suit against two German

———————————

[*] Honorable James L. Oakes, United States Circuit Judge for the Second Circuit, sitting by designation.

banks, Dresdner Bank and Deutsche Bank, to recover assets from her family's estate. The plaintiff alleges that the banks, through the Nazi Regime's program of "Aryanization," stole her family's interest in its manufacturing company, Orenstein & Koppel ("O&K"). The district court granted summary judgment for the defendant banks on multiple grounds, including the political question doctrine, international comity, statute of limitations and failure to state a claim. For the reasons that follow, we affirm the decision of the district court.

## I. Background

### A. The History of the Orenstein's Interests in O&K

In 1876, the plaintiff's great-grandfather, Benno Orenstein, together with Arthur Kopel, created O&K, which became Germany's sixth largest manufacturer of machinery. The company produced heavy earth-moving equipment and railway lines.[1] Benno Orenstein was the Director General of O&K until his death in 1926, when his son, Alfred Orenstein, became Managing Director. At this time, the Orenstein family's shares of O&K were distributed equally among Benno Orenstein's four children, although members of the family were not permitted to sell the shares

---

[1] O&K exists today as a subsidiary of the Fiat Group and it continues to produce railroad, construction, and excavation equipment.

without Alfred Orenstein's permission for ten years. Ungaro-Benages alleges that the family maintained a controlling interest in the company, including hundreds of thousands of preferred shares and common shares.[2]

Ungaro-Benages does not have precise information on what happened to the O&K shares once the Nazi party came to power. She alleges that because the Orensteins were Jewish, their ownership in O&K was vulnerable to "Aryanization," a state-instituted program in which Jewish assets were transferred to non-Jews by way of "boycotts, force, terror and coercion." Jewish owners were ousted from the boards of German corporations and assets were sold to non-Jews at nominal values. German banks, including the defendants in this action, acted as "trustees" for Jewish assets and aided the German government in transferring these assets away from their Jewish owners. The plaintiff alleges that both defendant banks were voluntarily involved in and profited from the state practice of Aryanization. She further alleges that the defendant banks continue to this day to conceal documentary evidence of their actions.

In the case of O&K, Ungaro-Benages alleges that Dresdner Bank, with the assistance of Deutsche Bank, successfully ousted the Orensteins from their positions on the board and effectively stole their stock. In her initial complaint, she maintains

---

[2] The plaintiff does not provide a figure of what the shares would be worth today.

that the Nazi government and the Dresdner Bank "pressured and coerced" the Orenstein family into an agreement whereby Erich Niemann, a Dresdner Bank managing director, took over day-to-day control of O&K and became a trustee for all of the Orenstein's shares of preferred and common stock. Niemann was replaced by Karl Rasche, another Dresdner Bank representative in 1935. By 1938, all of the Jewish members of O&K's board, as well as the boards of both banks, had been removed, and Alfred Orenstein had relocated to South Africa to manage the company's branch there. O&K later terminated its contract with Alfred Orenstein. The plaintiff alleges that, by 1943, Deutsche Bank owned two-thirds of all O&K shares and had completely divested the Orensteins of their interests in the company. There is only one record of any payment to an Orenstein family member for shares of stock: 37,943RM to Alfred Orenstein.

## B. Ungaro-Benages's Connection to O&K

Each of Benno Orenstein's four children received an equal share of the family's O&K stock upon his death. One of Benno's daughters, Lili, married and had two daughters, Ursula ("Ulla") and Liselotte. Ulla had a son, Peter Ungaro, and a daughter, Ursula Ungaro-Benages (the plaintiff). Liselotte had no heirs and left all of her assets to her sister (Ulla), Peter, and Ursula. The plaintiff now claims to

represent, along with her brother, one-quarter of the estate of Benno Orenstein.

The plaintiff only learned in 1993 that she was of Jewish descent. She did not discover until 2001 that she was the great-granddaughter of Benno Orenstein. Her grandmother, Lili Orenstein Berliner, did know about the family's history and attempted to ascertain what had happened to her interest in O&K. In 1950, Lili Berliner, through an attorney, wrote to Deutsche Bank requesting an accounting of her assets. Apparently Lili Berliner and her attorney took no further action. The plaintiff maintains that the bank did not provide any information and alleges that it still has failed to account for the assets.

## C.  The International Agreements Addressing WWII Claims

After the end of WWII, there were several international agreements addressing restitution and reparations. In its sector of occupied Germany, the United States enacted military laws requiring that property taken by the Nazi Regime be restored and providing that individuals could bring claims for restitution of identifiable property. In 1954, the United States government, together with the British and French governments, entered into an agreement to unite their sectors into an independent West German government. See Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, 6 U.S.T. 4117. This agreement

reaffirmed Germany's obligation to provide restitution as prescribed by United States' military law.[3]

In addition to claims by German nationals, the West German government also faced claims based on its wartime activities by other governments and foreign nationals. Many of the post-war treaties called for reparations, but the 1953 London Debt Agreement–an effort by Western powers to reindustrialize West Germany to help fight the Cold War–suspended these obligations. The suspension of claims was viewed as a suspension of the reparations question until a final post-war treaty on Germany was concluded, which did not occur until 1990 when Germany was reunified. In the 1990s, class-action lawsuits against the German government and private German companies increased dramatically in American courts, which caused considerable concern in Germany. In an effort to stem American litigation, the German government sought to enter into an international agreement with the United States to remove this litigation to an alternative forum based in Germany.

---

[3] The treaty provided that "[t]he Federal Republic hereby acknowledges the need for, and assumes the obligation to implement fully and expeditiously and by every means in its power, the legislation referred to in Article 1 of this Chapter [referencing the United States military law on restitution of identifiable property] and the programmes for restitution and reallocation thereunder provided." See Termination Agreement, ch. 3, art. II. Chapter Four of the Agreement obligated the Federal Republic of Germany to provide "adequate compensation" to those persecuted by the Nazi government, but explicitly excluded "identifiable property subject to restitution." See Termination Agreement, ch. 4, para. 1. Presumably this was because identifiable property would be subject to full, not adequate, restitution.

In 2000, President Clinton entered into an agreement with the German government ("the Foundation Agreement") aimed at achieving a "legal peace."[4]  See Agreement concerning the Foundation "Remembrance, Responsibility and the Future," July 17, 2000, U.S.-F.R.G., 39 I.L.M. 1298.  In the agreement, the German government agreed to establish a private foundation, the Foundation "Remembrance, Responsibility, and the Future" ("the Foundation"), to hear claims brought by victims of the Nazi regime.[5]  The Foundation is funded by voluntary contributions from the German government and German companies.  Both the United States government and the German government argue that this fund offers compensation to victims of the Nazi regime that would not be available through traditional litigation.

In return, the United States agreed to encourage its courts and state governments to respect the Foundation as the exclusive forum for claims from the National Socialist era.  The agreement, however, did not suspend or transfer lawsuits in American courts to Germany.  Instead, the United States promised to file a Statement of Interest in any lawsuit dealing with WWII restitution or reparations.[6]

---

[4] The agreement was concluded by the President without ratification by either 2/3 of the Senate or a majority vote of Congress.

[5] The Foundation would also hear claims concerning unpaid insurance policies and slave labor, two issues which had gone largely unaddressed earlier.

[6] The United States filed such a statement in this case, both before the district court and before this court.  The statement before the district court is included in the record excerpts.  The

7

The statement would inform United States courts that it is in the foreign policy interests of the United States for the case to be dismissed on any valid legal ground but would not suggest that the agreement itself provides an independent legal basis for dismissal.

## II.  Discussion

The district court dismissed the case on five grounds: (1) non-justiciable political question, (2) international comity, (3) statute of limitations, (4) failure to state a claim on which relief can be granted,[7] and (5) a lack of capacity to sue.[8] The

---

statement before this court is included in the United States' amicus brief.  The German government has also filed a statement of interest.

[7] The plaintiff also brought a claim under federal law for violations of international law.  However, no statute provides a private right of action for violations of international law and, thus, the plaintiff has failed to state a claim on which this court can grant relief.  This court previously has recognized a private right of action for violations of international law *only* where there is a statute expressing Congress's intention to permit private suits.   In Abebe-Jira v. Negewo, 72 F.3d 844 (11th Cir. 1996), this court recognized a private right of action under the Alien Tort Claims Act, 28 U.S.C. § 1350 (2004), which permits *aliens* to sue for torts committed in violation of international law.  There, this court's analysis was based on the language of the federal statute that "suggests that Congress did not intend to require an alien plaintiff to invoke a separate enabling statute as a precondition to relief."  Id. at 847. Here, however, the plaintiff cannot point to any statute that provides her with a private right of action to sue for violations of international law.  As an American citizen, the plaintiff cannot rely on the Alien Tort Claims Act and there is no alternative statement from Congress expressing its intent to recognize this cause of action.

[8]The district court determined that the plaintiff has not established that she has the capacity to represent the Orenstein estate.  The plaintiff's claim is derivative of the claims of her mother and grandmother, but under Florida law, she must show that she is the personal representative of the estate.  This is a defect that can be cured by a stay or amendment.  See Glickstein v. Sun Bank/Miami, N.A., 922 F.2d 666 (11th Cir. 1991).  Consequently, the district court stated that if this was the only impediment to the suit, it would have allowed an amendment

district court rejected the defendants' assertion that the act of state doctrine was another independent ground for dismissal. We affirm the district court's opinion based on international comity.

## A. Federal Common Law of Foreign Affairs

At the outset, we need to specify the source of law governing the present claim. We hold that federal law, rather than Florida law, governs notwithstanding the fact that the plaintiff brought state law claims against the defendant banks.

Under the *Erie* doctrine, a federal court adjudicating state law claims applies the substantive law of the state. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); Klaxon Co. v. Stentor Elective Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477(1941). The Supreme Court, however, has carved out exceptions to this doctrine where there are uniquely federal interests at stake. See Hinderlider v. La Plata River Co., 304 U.S. 92, 110, 58 S. Ct. 803, 82 L. Ed. 1202 (1938). One such exception applies to litigation that implicates the nation's foreign relations. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964) (applying federal law rather than New York law); Republic of the Philippines v. Marcos, 806 F.2d 344, 352-54 (2d Cir. 1986) (applying federal law

---

or stay instead of granting the motion to dismiss.

9

because the foreign relations implications of the litigation created uniquely federal interests).  Because our foreign relations could be impaired by the application of state laws, which do not necessarily reflect national interests, federal law applies to these cases even where the court has diversity jurisdiction.   As the Supreme Court explained in <u>Sabbatino</u>:

> We could perhaps in this diversity action avoid the question of deciding whether federal or state law is applicable to this aspect of the litigation....
>
> ****
>
> However, we are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law. It seems fair to assume that the Court did not have rules like the act of state doctrine in mind when it decided *Erie R. Co. v. Tompkins*.  Soon thereafter, Professor Philip C. Jessup, now a judge of the International Court of Justice, recognized the potential dangers were *Erie* extended to legal problems affecting international relations. He cautioned that rules of international law should not be left to divergent and perhaps parochial state interpretations.

376 U.S. at 424-26.

Here, the federal government has engaged in years of state-to-state negotiations and, in 2000, concluded an executive agreement with the German government addressing litigation arising from the National Socialist era.  In addition, the Supreme Court determined that this agreement preempts any contrary state law because such

state laws would interfere with the President's foreign affairs power.  See Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 123 S. Ct. 2374, 156 L. Ed. 2d 376 (2003) (finding that a California law requiring insurance companies to disclose Nazi Era life insurance policies was preempted by the executive agreement).  Thus, like the litigation in Sabbatino, the present litigation has sufficient ties to our nation's foreign relations that we apply federal law rather than state law.

B.  The Foundation Agreement

To resolve the present litigation, we begin by examining the Foundation Agreement, the agreement between the United States and Germany.[9]  The plaintiff

---

[9] The agreement is a treaty under international law but not a treaty under domestic law. Under international law, any agreement between states is a treaty.  The same is not true under federal law.  Article Two, Section 2 of the United States Constitution requires that an international agreement gain the advice and consent of two-thirds of the Senate to become a treaty.  Because the President formed this agreement without the advice and consent of the Senate, the Foundation Agreement is a "sole executive agreement," rather than a treaty, by American constitutional standards.  Nonetheless, it is still federal law.  The Supreme Court has held that sole executive agreements override inconsistent state law.  See United States v. Belmont, 301 U.S. 324, 327, 57 S. Ct. 758, 81 L. Ed. 1134 (1937) (holding that "no state policy can prevail against the international compact here involved");  Garamendi, 123 S. Ct. at 2387-88 (holding that "[g]enerally, then, valid executive agreements are fit to preempt state law, just as treaties are").  In Garamendi, an insurance association sued the State of California after it passed a state statute requiring all insurance companies to disclose information about policies sold in Europe between 1920 and 1945.  123 S. Ct. at 2379-85.  The Supreme Court held that the California law conflicted with the Foundation Agreement and, thus, found that the state law was preempted.
We acknowledge that an executive agreement could preempt state law under the President's foreign affairs power and yet include terms that may not be valid under federal law. See Dames & Moore v. Regan,  453 U.S. 654, 688, 101 S. Ct. 2972, 69 L. Ed. 2d 918 (1981)(finding that an executive agreement to settle claims was not a violation of federal law, in

11

argues that the agreement does not cover her suit because the relevant transactions took place before World War II, but the treaty's scope includes any actions committed during the National Socialist era. Article 1 states:

> The parties agree that the Foundation 'Remembrance, Responsibility and the Future' covers, and that it would be in their interests for the Foundation to be the exclusive remedy and forum for the resolution of, *all claims that have been or may be asserted against German companies arising from the National Socialist era* and World War II.

Foundation Agreement, art. I, para. 1, 39 I.L.M. at 1299 (emphasis added). Furthermore, the agreement explicitly covers property claims. In Annex B, the

---

part, because Congress acquiesced to the executive's action); see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) (Jackson, J., concurring) (explaining that the power of the executive depends, in part, on Congressional support, opposition, or silence). We do not believe, however, that the present agreement poses such a situation. Although Garamendi did not adjudicate the claim of a victim of National Socialism, the Supreme Court noted, in reference to the Foundation Agreement, that the President has broad powers to settle the international claims of its citizens, even those against foreign corporations. 123 S. Ct. at 2386-87. There, the Court stated:

> At a more specific level, our cases have recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic. Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice....
> ****
> The executive agreements at issue here do differ in one respect from those just mentioned insofar as they address claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone.

Id. at 2387.

United States government agreed to submit a statement of interest to federal courts announcing that the Foundation is the preferred forum for "the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II, including without limitation those relating to ... damage to or *loss of property, including banking assets* and insurance policies." Foundation Agreement, Annex B, para. 1, 39 I.L.M. at 1303 (emphasis added).[10]

The Foundation Agreement, however, does not provide the substantive law to resolve the case before us because it neither settles the outstanding claim nor directs that all claims be transferred to the Foundation's settlement procedures. Rather, the United States simply promises to announce that such a transfer is in the United States' national interests. In Annex B, the United States government is obliged to inform domestic courts that its policy interests "favor dismissal on any valid legal ground," but "does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal." Foundation Agreement, Annex B, para. 7, 39 I.L.M. at 1304. Thus, by its own terms, the agreement does not provide a basis to dismiss or suspend litigation against German companies stemming from their actions during the National Socialist era.

---

[10] Article 4 declares that "Annexes A, B and C shall be an integral part of this Agreement." Foundation Agreement, art. IV, 39 I.L.M. at 1300.

13

Because the Foundation Agreement firmly establishes that issues related to litigation against German corporations from the National Socialist era are governed by federal law, but does not provide any substantive principles by which to adjudicate this case, we must examine federal law not based in treaty to resolve the issues presented here.

In the following sections, we first determine that the case is justiciable. Although the case has implications for our foreign relations, our consideration of the claim is not barred by the political question doctrine. Second, based on the principle of international comity, we defer to the tribunal created by the Foundation Agreement to adjudicate the issues raised here.

C. The Political Question Doctrine

The district court found that this case implicates American foreign relations and, thus, is a political question, non-justiciable in domestic courts. We disagree.

The political question doctrine is based on the proper relationship between the judiciary and the political branches of government. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Courts refuse to adjudicate a claim under the political question doctrine where there

is found a textually demonstrable constitutional commitment of the issue

to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217.

Issues related to foreign affairs often are beyond the competence of the federal courts to resolve because they require judicial intervention in policy areas reserved to the political branches or could express a lack of respect due the other branches. Yet not all issues that could potentially have consequences to our foreign relations are political questions. As the Supreme Court stated in Baker v. Carr, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. at 211; see also Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986) (holding that federal courts have the authority to construe treaties and executive agreements even when it can have foreign affairs implications).

Here, none of the factors that advise against judicial resolution are present. Adjudication of the present claim would not interfere with the executive's handling of foreign relations or show a lack of respect to the executive's power in foreign

15

affairs. Indeed, the plain text of the Foundation Agreement anticipates that federal courts will consider claims against German corporations. The entirety of Annex B of the agreement is dedicated to explaining what the United States government will include in its Statement of Interest to American courts hearing these cases. Furthermore, the agreement itself provides that it does not provide an independent legal basis for dismissal. See Foundation Agreement, Annex B, para. 7, 39 I.L.M. at 1304. Thus, the executive opted not to settle these claims or to transfer the claims to the Foundation, although it had the power to do so.[11]

As a result, federal court consideration of the present case does not reflect a lack of respect for the executive nor does it interfere with American foreign relations. The United States is in full compliance with the Foundation Agreement so long as it files a statement of interest to courts urging respect for the Foundation as the exclusive forum to resolve these claims. This statement of interest from the executive

---

[11] This strategy of non-settlement distinguishes the Foundation Agreement from other claim settlement agreements previously applied by the federal courts. For instance, the Litvinov Agreement, which was the subject of the litigation in Belmont and Pink, explicitly settled all American claims against the Soviet Union stemming from its 1918 nationalization of property. Pink, 315 U.S. at 227-28; Belmont, 301 U.S. at 326. Similarly, the executive agreement between the United States and Iran, which was at issue in Dames & Moore, obligated the United States government "to terminate all legal proceedings in the United States courts involving claims of United States persons and institutions against Iran and state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." Dames & Moore, 453 U.S. at 665. The President also issued an executive order directing that all claims against the Iranian government be "suspended" in American courts. Id. at 666. The suspension would cease if the claims tribunal determined that it had did not have jurisdiction. Id.

is entitled to deference and we give the executive's statement such deference in our international comity analysis. See Republic of Austria v. Altmann, 124 S. Ct. 2240, 2255, 159 L. Ed. 2d 1, 22 (2004) (stating that "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy"). A statement of national interest alone, however, does not take the present litigation outside of the competence of the judiciary.[12]

The other four factors similarly do not lead us to conclude that the issue raised

---

[12] In holding that the present case is justiciable, we part ways with district courts that have also considered Nazi era claims. See In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d 370 (D. N.J. 2001); Burger-Fischer v. Degussa AG, 65 F. Supp. 2d 248 (D. N.J. 1999); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D. N.J. 1999). Two of these cases, Burger-Fischer and Iwanowa, were decided while the negotiations that culminated in the Foundation Agreement were still ongoing, and, thus, the courts did not know what the terms of the Foundation Agreement would be. In In re Nazi Era Cases, however, the court decided the case after the Foundation Agreement was formed and determined that continuing to exercise jurisdiction would show a lack of respect to the executive branch. 129 F.Supp.2d at 388-89. We disagree. Although the executive's statement of interest is entitled to deference, it does not make the litigation non-justiciable. Moreover, the judiciary is not interfering with foreign relations or showing a lack of respect to the executive when it interprets an international agreement and follows its terms. See Japan Whaling, 478 U.S. at 230.

Our holding is not in conflict with the Second Circuit's decision in In re Austrian and German Holocaust Litig., 250 F.3d 156 (2d Cir. 2001). There, the court instructed a district court to amend its order, which required the German government to pass additional legislation related to the Foundation Agreement. The Second Circuit used separation of powers principles to comment that the federal courts could not interfere with the executive's conduct of foreign relations by demanding that a foreign nation enact legislation. Here, we do not interfere with the executive's conduct of foreign relations by placing demands on foreign governments or requesting changes in foreign laws.

17

here is a political question. First, the issues addressed in the present litigation are not constitutionally committed to a coordinate political branch. The present litigation against two foreign corporations is subject to the political question analysis only because the executive has entered into international negotiations over this topic. Thus, the courts should look to the results of those negotiations to determine if judicial resolution of the claim would interfere with the executive's conduct of foreign relations. The Foundation Agreement is unambiguous in its expectation that federal courts will consider these cases and should dismiss them based on ordinary principles of federal law. Annex B states:

> Plaintiffs in these [Nazi era] cases face numerous legal hurdles, including, without limitation, justiciability, international comity, statutes of limitation, jurisdictional issues, forum non conveniens, difficulties of proof, and certification of a class of heirs. The United States takes no position here on the merits of the legal claims or arguments advanced by plaintiffs or defendants. *The United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal*, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground.

See Foundation Agreement, Annex B, para. 7, 39 I.L.M. at 1304 (emphasis added). The President could have settled these cases. In that case, federal courts would be interfering with the executive's conduct of foreign relations if we continued to exercise jurisdiction. Such is not the situation here. The President has purposefully chosen not to settle these claims directly and, instead, has instructed the federal courts

to use existing legal grounds.

Second, consideration of the present case will not lead to multifarious pronouncements that could potentially embarrass the executive. Quite the opposite, the governments anticipated that federal courts would consider cases against the German government or German corporations. Third, the issues raised here can be resolved through judicially discoverable and manageable standards. Federal courts adjudicate claims against foreign corporations everyday and can consider the nation's foreign policy interests and international comity concerns in their decisions. Finally, adjudication of the present case does not require the courts to make a policy determination.

D. International Comity

International comity reflects "the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." Hilton v. Guyot, 159 U.S. 113, 163, 16 S. Ct. 139, 40 L. Ed. 95 (1895). It is an abstention doctrine: A federal court has jurisdiction but defers to the judgment of an alternative forum. Turner Entm't Co. v. Degeto Film, 25 F.3d 1512, 1518 (11th Cir.

1994).[13] International comity serves as a guide to federal courts where "the issues to be resolved are entangled in international relations." In re Maxwell Communication Corp., 93 F.3d 1036, 1047 (2d Cir. 1996). The district court dismissed this case on international comity grounds in favor of resolution at the Foundation because the Foundation is a specialized system, supported by the United States government and the international community, for addressing Nazi era claims.  The district court further considered that all of the relevant transactions leading to this suit took place in Germany and, thus, Germany was the most appropriate forum state for the resolution of these claims.

The doctrine of international comity can be applied retrospectively or prospectively.  When applied retrospectively, domestic courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings. See, e.g., Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240 (2d Cir. 1999) (affording comity in deference to concurrent foreign bankruptcy proceedings); Turner Entm't, 25 F.3d at 1514 (staying domestic legal proceedings to defer to concurrent German proceedings on the merits of the dispute);  Cunard S.S. Co. v. Salen Reefer

---

[13]Abstention doctrines are prudential doctrines and this court is not obligated under American statutory law to defer to foreign courts.  Turner Entm't, 25 F.3d at 1518 ("Federal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred upon them.  Nevertheless, in some private international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction.")(internal citations omitted).

Servs. AB, 773 F.2d 452 (2d Cir. 1985) (deferring to foreign bankruptcy proceedings); see also Canadian S. Ry. Co. v. Gebhard, 109 U.S. 527, 3 S. Ct. 363, 27 L. Ed. 1020 (1883) (dismissing the claims of American railroad bond holders in favor of Canadian legislation and legal proceedings aimed at reorganizing the railroad's corporate structure).

When applied prospectively, domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum. See Bi v. Union Carbide Chems. & Plastics Co., 984 F.2d 583 (2d Cir. 1993) (dismissing the claims of Indian nationals injured by a chemical plant explosion in Bhopal based on Indian legislation granting the Indian government exclusive standing to represent all victims); see also Jota v. Texaco, 157 F.3d 153 (2d Cir. 1998) (considering whether to dismiss proceedings related to environmental damage in Equador based on Equador's interest in foreign or domestic resolution and holding dismissal on grounds of *forum non conveniens* and comity erroneous); Pravin Banker Assocs. Ltd. v. Banco Popular del Peru, 109 F.3d 850 (2d Cir. 1997) (considering whether to stay proceedings brought by an American holder of Peruvian debt while Peru attempted to renegotiate its commercial debt under the Brady Plan).

The analysis for both forms of international comity embody similar concerns

with foreign governments' interests, fair procedures, and American public policy, but they emphasize different issues. When applied retrospectively, federal courts evaluate three factors: (1) whether the foreign court was competent and used "proceedings consistent with civilized jurisprudence," (2) whether the judgment was rendered by fraud, and (3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just. Turner Entm't, 25 F.3d at 1519. Courts also consider whether the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments. Id. at 1521.

Applied prospectively, federal courts evaluate several factors, including the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum. See Jota, 157 F.3d at 160 (holding that courts should consider the adequacy of the foreign forum and the strength of the foreign government's interests); Pravin Banking Assocs., 109 F.3d at 854-55 (considering the strength of American public policy interests in debt enforcement and the foreign government's interest in debt reorganization); Bi, 984 F.2d at 585-86 (considering the strength of the foreign government's interest in efficiently addressing a mass tort that took place within its borders). Our determination of the adequacy of the alternative forum is informed by *forum non conveniens* analysis. See Jota, 157 F.3d at 1610 (noting that *forum non*

22

*conveniens* analysis on the adequacy of the foreign forum is equally pertinent to international comity analysis); <u>see</u> <u>also</u> <u>Ford v. Brown</u>, 319 F.3d 1302, 1304 n.3 (finding that the international comity analysis and the *forum non conveniens* calculus were intertwined).

Here, we decide to abstain based on the strength of our government's interests in using the Foundation, the strength of the German government's interests, and the adequacy of the Foundation as an alternative forum. The United States government has consistently supported the Foundation as the exclusive forum for the resolution of litigation against German corporations related to their acts during the National Socialist era. The President entered into negotiations with the German government and determined that the interests of American citizens, on the whole, would be best served by establishing the Foundation Agreement.[14] The agreement offers monetary compensation to nationals who were used as slave labor and were victims of insurance fraud as well as those deprived of their property. The fund to provide this compensation was established with the expectation that all such American litigation against German corporations would be resolved at the Foundation. In creating a comprehensive compensatory scheme for all remaining victims of the Nazi era, the

---

[14] Even if the governments had not engaged in negotiations on this issue, the executive's statements of national interest in issues affecting our foreign relations are entitled to deference. See <u>Altmann</u>, 124 S.Ct. at 2255.

23

Foundation Agreement may end up favoring the monetary interests of some American victims more than others. International agreements, however, often favor some domestic interests over others, and the President has the constitutional authority to settle the international claims of American citizens, even if the claimants would prefer litigation in American courts. See Garamendi, 123 S. Ct. at 2386-88; Dames & Moore, 453 U.S. at 688. Likewise, the German government has a significant interest in having the Foundation be the exclusive forum for these claims in its efforts to achieve lasting legal peace with the international community.

Furthermore, the Foundation is an adequate alternative forum. The tribunal has a speciality in the relevant post-war law and has relaxed standards of proof to ease the burden for the potential plaintiffs to obtain compensation. The Foundation offers victims of the Nazi era an adequate remedy, even if the Foundation cannot provide as substantial an award as American courts. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) (noting that a forum can be adequate even where there is the potential for a smaller damage award); see also Leon v. Million Air, Inc., 251 F.3d 1305, 1311-12 (noting that federal courts are generally unwilling to find that foreign forums are inadequate based on unsupported allegations that the forum will be partial or inefficient.)

The plaintiff maintains that the forum does not provide her with a remedy

because her claims are barred under the Foundation Agreement. Our reading of the Foundation Agreement, however, does not lead us to the conclusion that her claims necessarily would be barred. Annex A of the agreement specifically addresses claims of deprivation of property by German companies based on discrimination.[15] That provision provides that the plaintiff's claims would be barred if her family could have received compensation under the German restitution laws. The plaintiff is free to argue to the Foundation, just as she has argued to this court, that her claims should not be barred because the defendant banks prevented her family from pursuing their property claims after the war. The Foundation is in just as good a position as this court to consider the allegedly fraudulent acts by the defendant banks and is likely to

---

[15] Paragraph 11 of Annex A states:

The Foundation legislation will provide that persons who suffered loss of or damage to property during the National Socialist era as a result of racial persecution directly caused by German companies are eligible to recover under the payment system set forth in paragraph 11. The eligibility of such persons will be limited to those who could not receive any payment under the BEG or Federal Restitution Law ("BRueckG") because they did not meet the residency requirement or could not file their claims by the deadline because they lived under a government with which the Federal Republic of Germany did not have diplomatic relations, those whose claims were rejected under the BEG or BRueckG where legal proof became available only after the reunification of the Federal Republic of Germany, provided the claims were not covered by post-reunification restitution or compensation legislation, and those whose racially-motivated property claims concerning moveable property were denied or would have been denied under the BEG or BRueckG because the claimant, while able to prove a German company was responsible for seizing or confiscating property, was not able to prove that the property was transferred into then-West Germany (as required by law) or, in the case of bank accounts, that compensation was or would have been denied because the sum was no longer identifiable, where either (a) the claimant can now prove the property was transferred into then-West Germany or (b) the location of property is unknown.

25

be far more familiar than this court with German law on the relevant issues.

Moreover, if we did not abstain on international comity grounds, we would have to address whether the plaintiff's claim is barred under American law based on the statute of limitations. The plaintiff's grandmother, from whom the plaintiff's claim is derivative, began proceedings to recover her family's assets in 1950 but then failed to pursue her claim. The district court, applying German law, found that the plaintiff's claim was time barred. We do not reach the issue because we defer to the Foundation, but note the plaintiff faces similar hurdles in federal court to those she would face at the Foundation.

We recognize that the plaintiff would prefer to pursue her claim in federal court. She is an American citizen, and even though her claim is derivative of her grandmother, we give particular attention to her choice of forum. On balance, however, we find that the strength of the interests held by the American government and the German government outweigh the plaintiff's preference. In doing so, we note that American and German governments have entered into extensive negotiations over this subject and those negotiations affect thousands of other victims of the Nazi regime. While we do not use the Foundation Agreement as an independent legal basis to dismiss this case, we must take the governments' ongoing interests in settling claims from the National Socialist era and World War II into account in our

international comity analysis. We further note that all of the relevant events implicated in this litigation took place in Germany and will involve issues of German law. Finally, the plaintiff has an alternative forum, established in part by the United States government, where she can seek redress.

Conclusion

We are sympathetic to the plaintiff and only too cognizant of the horrors suffered by her grandparents and thousands of others under the Nazi regime. Although it may not be her forum of choice, the plaintiff should pursue her claim through the Foundation, which was established by the American and German governments to address exactly these types of claims from the Nazi era.

For the above reasons, we AFFIRM the decision of the district court.