# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1625

_____

Sr. Kate Reid; Megan Heeney, as next friends of; A. O. A.; Meylith A. Caso Arroyo; Y. C. A.; A. C. C.; D. R. G.; J. R. G.; S. A. L.; Jean P. Quispe Morales; B. Q. M.

*Plaintiffs - Appellees*

v.

The Doe Run Resources Corporation, a New York Corporation; D. R. Acquisition Corp., a Missouri Corporation; Marvin K. Kaiser; Albert Bruce Neil; Jeffrey L. Zelms; The Renco Group, Inc.; Ira L. Rennert; Doe Run Cayman Holdings LLC, a Missouri limited liability company

*Defendants - Appellants*

------------------------------

National Mining Association; Associated Industries of Missouri; Chamber of Commerce of the United States of America; Missouri Chamber of Commerce and Industry; State of Missouri

*Amici on Behalf of Appellant(s)*

Former U.S. Diplomats and Government Officials; William S. Dodge; Maggie Gardner

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 9, 2024
Filed: August 1, 2024

_____

Before BENTON, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

This consolidated action comprises 40 cases and more than 1,420 individual plaintiffs who are Peruvian citizens alleging environmental injury by exposure to toxic substances from La Oroya Metallurgical Complex ("LOMC"), a smelting and refining complex in rural Peru. The defendants are United States-based entities consisting of Doe Run Resources Corporation, The Renco Group, Inc., and related companies and certain executives and directors at those companies (collectively "Doe Run") that purchased LOMC in 1997. In this latest appeal, Doe Run argues the district court[1] erred by denying its motion to dismiss the appeal based on the doctrine of international comity. We affirm.

## I.    BACKGROUND

LOMC began operations in 1922 under the ownership of Cerro de Pasco Corporation in the remote village of La Oroya, which is located high in the Andes mountains of Peru. Using smelters and refineries, LOMC processed mined minerals into copper, lead, zinc, and other metals. In 1974, the government of Peru took control of LOMC and transferred the ownership and operations to a state-owned company, Centromin Peru S.A. Nearly two decades later, LOMC was offered for sale, and Doe Run emerged as a prospective buyer. Under Peruvian law, only a Peruvian company could purchase LOMC, so Doe Run created a Peru-based subsidiary, Doe Run Peru, and its direct parent company in Peru, Doe Run Mining.

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

On October 23, 1997, Doe Run purchased LOMC through a Stock Transfer Agreement executed by Doe Run Peru. At the time Doe Run acquired LOMC, the smelter and refinery operations were subject to an Environmental Remediation and Management Plan. LOMC operated continuously until it ceased operations in June 2009. Doe Run Peru initiated bankruptcy proceedings shortly thereafter.

In 2007, Sister Kate Reid and Megan Heeney filed several common law tort lawsuits in Missouri state court against Doe Run as next friends on behalf of the injured Peruvian citizens, who were children at the time of the alleged harm. Plaintiffs claim that Doe Run Peru failed to sufficiently reduce lead emissions from LOMC, as required under the terms of the Environmental Remediation Management Plan, which resulted in unsafe lead levels in the air. The plaintiffs' case under Missouri law relies on a theory that Doe Run Peru was controlled from the United States by Doe Run, and that decision-making by Doe Run executives in the United States exposed the plaintiffs to lead poisoning and caused them to suffer persistent and irreversible cognitive impairments.

Many more Peruvian citizens have commenced actions through Reid and Heeney in Missouri state court, and each of those cases has been removed to federal court and consolidated with this current action.[2] Doe Run filed a motion to dismiss, which resulted in the dismissal of several claims and defendants. See A.O.A. v. Rennert, 350 F.Supp.3d 818 (E.D. Mo. 2018). The district court has permitted the

---

[2]The original case was removed to federal court and then remanded for lack of subject matter jurisdiction. An amended complaint was also removed but later dismissed without prejudice by the plaintiffs. Two more cases were filed in Missouri state court, removed to federal court, and remanded for lack of subject matter jurisdiction. In 2010, The Renco Group initiated arbitration proceedings, seeking indemnification against Peru. Doe Run again removed the pending cases to federal court, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 205. The district court denied the plaintiffs' motion to remand and Doe Run's motion to stay the proceedings pending arbitration. This Court affirmed those denials in Reid v. Doe Run Resources Corp., 701 F.3d 840 (8th Cir. 2012).

substantive negligence-based claims to survive and has concluded that Missouri state law applies. Doe Run filed a motion for determination of foreign law, urging the district court to abstain based on the doctrine of international comity because, in its view, the lawsuits impacted Peru's sovereignty and were "inconsistent with the text and spirit" of the applicable Trade Promotion Agreement ("TPA") between the United States and Peru. The district court denied the motion.

After discovery, Doe Run filed motions for summary judgment and renewed its argument that Peruvian law should apply. Doe Run also renewed its motions for dismissal based on international comity. The district court denied the motion to apply Peruvian law, except to the extent that Doe Run seeks to apply Article 1971's "safe harbor" defense. The court denied summary judgment on the safe harbor defense and denied dismissal based on international comity. Rather than reaching the merits of the summary judgment motions, the district court certified its choice-of-law and comity rulings for interlocutory appeal, and we accepted the appeal.

## II.    ANALYSIS

We review a district court's decision on international comity for abuse of discretion. GDG Acquisitions, LLC v. Government of Belize, 749 F.3d 1024, 1030 (11th Cir. 2014) (citation omitted); see also City of Jefferson City, Mo. v. Cingular Wireless, LLC, 531 F.3d 595, 599 (8th Cir. 2008) (abuse of discretion standard in cases involving whether to abstain where federal and state jurisdictions are involved). We will find an abuse of discretion when the district court relies on clearly erroneous factual findings or an error of law. Dixon v. City of St. Louis, 950 F.3d 1052, 1056 (8th Cir. 2020).

"International comity is an abstention doctrine that reflects 'the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation.'" GDG Acquisitions, 749 F.3d at 1030 (quoting Hilton v. Guyot, 159 U.S. 113, 163 (1895)). The doctrine of comity "is not a rule of law,

-4-

but one of practice, convenience, and expediency." Id. (quoting Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971)). "Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." Id.

The defendants argue the doctrine of international comity compels abstention from adjudicating the plaintiffs' claims in United States courts. See Turner Ent. Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994) ("[I]n some private international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction."). Specifically, they argue abstention is required based on the TPA, traditional comity factors, or principles of extraterritoriality.

*A.    Whether dismissal is required under the TPA*

Treaty interpretations are questions of law that we review *de novo*. Smythe v. U.S. Parole Com'n, 312 F.3d 383, 385 (8th Cir. 2002). "The interpretation of a treaty, like the interpretation of a statute, begins with its text." Golan v. Saada, 596 U.S. 666, 676 (2022) (quoting Abbott v. Abbott, 560 U.S. 1, 10 (2010)).

The TPA is a trade agreement covering several diplomatic and trade-related issues across a wide range of topics, including, as examples, agriculture, textiles, and taxes. Specific to this litigation, Chapter 18 of the TPA addresses the environment— it encourages cooperation and collaboration between the United States and Peru to improve environmental protections and address environmental harms, while recognizing each nation's sovereign interests. The TPA emphasizes the importance of enforcing environmental laws, with both the United States and Peru providing for procedures to investigate and adjudicate alleged violations, along with providing appropriate and effective sanctions or other remedies. See Chapter 18.4(3)-(4). In particular, Chapter 18.4(4) states:

Each Party shall provide persons with a legally recognized interest under its law in a particular matter appropriate and effective access to remedies for violations of that Party's environmental laws or for violations of a legal duty under that Party's law relating to the environment or environmental conditions affecting human health, which may include rights such as: (a) to sue another person under that Party's jurisdiction for damages under that Party's laws . . . .

The litigation before us does not follow customary pleading practices—that is, the plaintiffs are suing for environmental harms in Peru allegedly caused by conduct that occurred in the United States, applying a legal theory of negligence under Missouri state law. The plaintiffs' specific claims and methods for relief are not explicitly addressed by the TPA, which contemplates more traditional mechanisms for environmental enforcement. But the plain language of Chapter 18.4(4) does provide a pathway for the plaintiffs to sue the defendants under Missouri law. See United States v. Ron Pair Enters, Inc., 489 U.S. 235, 240-41 (1989) ("[T]here generally is no need for a court to inquire beyond the plain language of the statute."). Looking to the implementing statute, we find further support for the instant litigation in the following declaration by Congress: "No State law, or the application thereof, may be declared invalid as to any person or circumstance on the ground that the provision or application is inconsistent with the [TPA] . . . ." See Pub. L. No. 110-138, 121 Stat. 1455, § 102(b)(1) (2007); 19 U.S.C. § 3805. On these facts and claims, the district court did not abuse its discretion in concluding that dismissal is not required under the TPA.

B.    *Whether traditional comity factors require dismissal*

Typically, international comity is applied retrospectively, either out of respect for the judgment of a foreign tribunal or in deference to parallel foreign proceedings. GDG Acquisitions, 749 F.3d at 1030. Only in rare circumstances have courts applied international comity prospectively, without a conflicting foreign proceeding. "In such cases, 'domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum.'" Id. (quoting

Ungaro–Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004)). While there is no consistent rule for how to evaluate the international comity doctrine prospectively, three guiding factors have emerged from precedent: "the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum." Id.

Assuming without deciding that prospective international comity exists as an abstention doctrine, it must be reserved for those "rare (indeed often calamitous) cases in which powerful diplomatic interests of the United States and foreign sovereigns aligned in supporting dismissal." GDG Acquisitions, 749 F.3d at 1034. Here, the harm occurred in Peru, but Doe Run's alleged conduct occurred in Missouri. Neither the State Department nor the government of Peru has submitted a declaration of its position in this case, despite requests from the parties. Peru has had fifteen years while this matter has been in litigation to directly assert its sovereignty and it (and the State Department) has remained silent. In its brief, Doe Run takes issue with the district court's order on the first motion to dismiss that found some defendants were unwilling to submit to Peru's jurisdiction and now asserts that all defendants have consented to personal jurisdiction in Peru. While the timeliness of the consent can be debated, the record also contains letters from Peruvian officials suggesting there does not appear to be an adequate forum or remedy available to the plaintiffs under Peruvian law. Under the circumstances of this case, we do not have that rare case before us where application of prospective international comity may be warranted, and we find no abuse of discretion by the district court in the denial of abstention based on international comity.

## C. *Whether extraterritoriality principles warrant abstention*

The defendants argue for dismissal of the complaint based on extraterritoriality concerns, citing the Supreme Court's decision in Nestlé USA, Inc. v. Doe, 593 U.S. 628 (2021). However, this case differs from Nestlé in two important ways. First, Nestlé involved foreign application of a federal statute, whereas here we have domestic application of state common law. In addition, in

Nestlé, extraterritorial application was ruled inappropriate because nearly all the alleged conduct occurred overseas.  Not so here—the plaintiffs uniquely allege conduct that occurred within the United States as the basis for liability.  See RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 337 (2016).  Further, the district court detailed the discovery that supported the allegations.  It was not an abuse of discretion to determine the record sufficiently supported claims that decision-making in the United States caused the plaintiffs' injuries for purposes of summary judgment.

## III.  CONCLUSION

We affirm the judgment of the district court.  The motion to strike is denied.

_____