**Luis Alberto Galvis MUJICA,
et al. Plaintiffs,**

v.

**OCCIDENTAL PETROLEUM CORP.,
et al. Defendants.**

**No. 032860WJR(JWJX).**

United States District Court,
C.D. California.

June 28, 2005.

Bridget Arimond, Douglass W. Cassel, Chicago, IL, Daniel M. Kovalik, Pittsburgh, PA, Derek J. Baxter, Jeffrey Vogt,

Terry Collingsworth, Washington, DC, Paul L. Hoffman, Schonbrun Desimone Seplow Harris and Hoffman, Venice, CA, for Plaintiffs.

Daniel P. Collins, Daniel Luke Geyser, John W. Spiegel, Munger Manuel F. Cachan, Tolles & Olson, Los Angeles, CA, Kristin Linsley Myles, Munger Tolles & Olson, San Francisco, CA, Kenneth J. Berke, Berke & Kent, Calabasas, CA, Sara M. Fotopulos, Thomas E. Fotopulos, Fotopulos & Fotopulos, Riverview, FL, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE ACTION UNDER THE DOCTRINES OF *FORUM NON CONVENIENS* AND INTERNATIONAL COMITY

REA, District Judge.

The matter came on for hearing before the Court, the Honorable William J. Rea, Judge, presiding, on January 10, 2005. Having considered the motion, the papers filed in support thereof and in opposition thereto, the oral argument of counsel, and the file in the case, the Court now makes the following decision: the Court hereby DENIES Defendant Occidental Petroleum Corp.'s Motion to Dismiss the Action under the Doctrines of *Forum Non Conveniens* and International Comity.[1]

### BACKGROUND

**I. Factual Allegations**

The instant case arises from a bombing that occurred in Santo Domingo, Colombia on December 13, 1998. In 1998, Plaintiffs lived in Santo Domingo. The Defendants, Occidental Petroleum Corp. ("Occidental") and AirScan, Inc., are both American companies; the former is located in Los Angeles, the latter in Florida. Defendant Occidental operates, as a joint venture with the Colombian government, an oil production facility and pipeline in the area of Santo Domingo.

Plaintiffs allege the following relevant facts. Since 1997, Defendant AirScan has provided security for Defendant Occidental's oil pipeline against attacks from left-wing insurgents. *See* First Amended Complaint ("FAC") at ¶ 15. Prior to 1998, Defendants worked with the Colombian military, providing them with financial and other assistance, for the purpose of furthering Defendant Occidental's commercial interests. *See id.* at ¶ 16. On several occasions during 1998, Defendant Occidental provided Defendant AirScan and the Colombian military with a room in its facilities to plan the Santo Domingo raid. *See id.* at ¶ 19. Defendant AirScan and the Colombian Air Force ("CAF") carried out this raid for the purpose of providing security for Defendant Occidental (i.e., protecting its oil pipeline) and was not acting on behalf of the Colombian government. *See id.* During the raid, three of Defendant AirScan's employees, along with a CAF liaison, piloted a plane with CAF markings that was paid for by Defendant Occidental. *See id.* From this airplane, Defendant AirScan provided aerial surveillance for the CAF, helping the CAF identify targets and choose places to deploy troops. *See id.* at ¶ 3.

On December 13, 1998, residents of Santo Domingo saw low-flying CAF helicopters overhead and attempted to communicate that they were civilians by lying down on the road and covering their heads with white shirts. *See id.* at ¶¶ 19–20. Soon thereafter, several witnesses saw an object (or several objects) drop from one of the CAF helicopters. *See id.* One of the cluster bombs dropped by the CAF exploded directly in the town of Santo Domingo, destroying homes and killing seventeen civilians and wounding twenty-five others.

---

1. Defendant AirScan, Inc. has joined this motion.

*See id.* at ¶ 21. Of the seventeen killed, six were children. *See id.* During the attack, the CAF helicopters knowingly fired on civilians attempting to escape and on those who were trying to carry the injured to a medical facility. *See id.* at ¶ 24. Soon thereafter, other CAF troops entered the town, blocked civilians from leaving, and ransacked their homes. *See id.*

While the purpose of the Santo Domingo raid was to protect Defendant Occidental's pipeline from attack by left-wing insurgents, no insurgents were killed in the attack. *See id.* at ¶ 25. These insurgents were located at least one to two kilometers outside of the Santo Domingo. *See id.* Defendants knew that the insurgents were not in Santo Domingo but carried out the attack nonetheless. *See id.*

Plaintiff Luis Alberto Galvis was approximately 800 to 1000 meters outside of Santo Domingo during the raid. *See id.* at ¶ 27. After he saw a CAF helicopter and heard an explosion, he attempted to return to Santo Domingo. *See id.* Before he could enter, a CAF helicopter fired upon him and prevented him from returning. *See id.* The next day, Plaintiff Luis Alberto Galvis learned that his mother, Teresa Mujica Hernandez, his sister, Edilma Leal Pacheco, and his cousin, Johanny Hernandez Becerra, had been killed during the raid. *See id.* at ¶¶ 22, 28.

Plaintiff Mario Galvis, Luis Alberto Galvis' father, was also in Santo Domingo at the time of the bombing and was injured during the raid. *See id.* at ¶ 23. Bomb shrapnel tore through his chest, breaking both of his collar bones. *See id.* He was subsequently hospitalized and continues to suffer chronic pain from these injuries. *See id.* During the raid, he also saw his wife, Teresa Mujica Hernandez, and daughter, Edilma Leal Pacheco, killed as a result of Defendants' actions. *See id.*

Plaintiff John Mario Galvis, Luis Alberto Galvis' younger brother and Mario Galvis' son, was in Santo Domingo at the time of the bombing. *See id.* During the raid, he saw his mother, Teresa Mujica Hernandez, and sister, Edilma Leal Pacheco, killed as a result of Defendants' actions. *See id.*

Plaintiffs have made other allegations regarding the events that took place after the bombing. The Court will refer to those allegations as necessary in the course of its opinion.

## II. Procedural History

On April 24, 2003, Plaintiff Luis Alberto Galvis Mujica filed a Complaint, on behalf of himself and Teresa Mujica Hernandez, Edilma Leal Pacheco, and Johanny Hernandez Becerra. On October 6, 2003, Plaintiffs filed their FAC, adding Plaintiffs Mario Galvis Gelvez and John Mario Galvis Mujica. In their FAC, Plaintiffs have brought federal claims under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection Act, 28 U.S.C. § 1350 Note, as well as state law claims of wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of Cal. Bus. & Prof.Code § 17200.

On January 20, 2004, the Court GRANTED Defendant Occidental's Motion requesting that the Court solicit the views of the United States Department of State regarding potential foreign policy implications raised by this action. On April 2, 2004, the Department of State filed a Statement of Interest indicating that it did not yet have a position on the foreign policy implications of this case. On July 22, 2004, the parties stipulated to an extended briefing schedule regarding Defendant Occidental's motions to dismiss. This briefing schedule was extended so that the parties could incorporate the Supreme Court's June 29, 2004 decision in *Sosa v.*

*Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). The parties completed their briefing on December 20, 2004.

On December 30, 2004, the State Department filed a Supplemental Statement of Interest indicating that it now opposes the pursuit of the instant litigation since it would severely impact this country's diplomatic relationship with Colombia. As part of that Supplemental Statement of Interest, the State Department attached a letter from the Colombian government indicating that it also opposed this litigation.

On January 20, 2004, the Court heard oral argument on Defendant's motions. During that oral argument, the parties requested the opportunity to file additional briefs addressing the Supplemental Statement of Interest. That supplemental briefing was completed on February 16, 2005. Since February, the parties have continued to file supplemental declarations and supplemental authority with the Court.

## DISCUSSION

### I. Forum non conveniens

#### A. Legal standard

"[U]nder the ancient doctrine of forum non conveniens, there are circumstances under which a court may dismiss an action because the chosen forum, while a proper venue, is inconvenient." Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3828, at 278 (2d ed.1986).

■ The standard governing a motion to dismiss on the basis of forum non conveniens is whether "defendants have made a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1118 (9th Cir.2002) (quoting *Cheng v. Boeing Co.,* 708 F.2d

1406, 1410 (9th Cir.1983)). "Forum non conveniens is 'an exceptional tool to be employed sparingly, [not a] ... doctrine that compels plaintiffs to choose the optimal forum for their claim.'" *Id.* (quoting *Ravelo Monegro v. Rosa,* 211 F.3d 509, 514 (9th Cir.2000)).

■ "A party moving to dismiss based on *forum non conveniens* bears the burden of showing (1) that there is an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal." *Dole Food,* 303 F.3d at 1118 (9th Cir.2002) (citing *Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1142–43 (9th Cir.2001)).

■ "The plaintiff's choice of forum will not be disturbed unless the 'private interest' and 'public interest' factors strongly favor trial in the foreign country." *Id.* (citing *Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1334 (9th Cir.1984)). However, the choice of forum made by "citizens or residents" should receive "somewhat more deference" than that of "foreign plaintiffs." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 256 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). "But less deference is not the same thing as no deference." *Ravelo Monegro,* 211 F.3d at 514.

#### 1. Adequate alternative forum

■ "'The defendant bears the burden of proving the existence of an adequate alternative forum.'" *Lueck,* 236 F.3d at 1143 (quoting *Cheng,* 708 F.2d at 1411). "An alternative forum ordinarily exists when defendants are amenable to service of process in the foreign forum. A foreign forum is adequate when it provides the plaintiff with a sufficient remedy for his wrong." *Dole Food,* 303 F.3d at 1118 (citation omitted).

#### 2. Private interest factors

■ "Courts consider the following private interest factors: (1) the residence of

the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Lueck*, 236 F.3d at 1145 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

### 3. Public interest factors

■ "Courts consider the following public interest factors: (1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum." *Id.* at 1147.

### 4. Choice of law determination

A district court must also make a choice of law determination in considering whether to dismiss on the basis of forum non conveniens. *See id.* at 1143.

## B. Application to the Instant Case

### 1. Burden of persuasion

Defendant argues that the typical deference given to a plaintiff's choice of forum is lessened because the Plaintiffs are all non-citizens. *See* Reply at 14–15.

While this is true, the Court wishes to emphasize that the burden remains on Defendant in this motion. The Plaintiffs' status as non-citizens means that the Court provides less deference to their choice of this Court as the forum, but the Court acknowledges that "less deference" is not "no deference." *See Ravelo Monegro*, 211 F.3d at 514. *See also Creative Technology, Ltd. v. Aztech System Pte. Ltd.*, 61 F.3d 696, 703 (9th Cir.1995) ("While there is normally a strong presumption in favor of honoring the plaintiff's choice of forum, a foreign plaintiff's choice is afforded less deference."); *Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 609 (3d Cir.1991) (holding that in cases involving foreign plaintiffs, defendants must establish a "strong preponderance" in favor of dismissal).

In addition, the Court considers the possibility that Plaintiffs chose this forum in order to obtain personal jurisdiction over Defendant Occidental. "The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference will be given to the plaintiff's forum choice." *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71–72 (2d Cir.2001) (en banc). "One of the factors that necessarily affects a plaintiff's choice of forum is the need to sue in a place where the defendant is amenable to suit." *Id.* at 72. "A plaintiff should not be compelled to mount a suit in a district where she cannot be sure of perfecting jurisdiction over the defendant, if by moving to another district, she can be confident of bringing the defendant before the court." *Id.* at 73.

### 2. Adequate alternative forum

As an initial matter, Defendant stipulates to service of process and consents to jurisdiction in Colombia. *See* Motion at 7. "Ordinarily, [the adequate alternative forum] requirement will be satisfied when the defendant is 'amenable to service of process' in the other jurisdiction." *Piper Aircraft*, 454 U.S. at 255 n. 22, 102 S.Ct. 252. *See also Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir.1991) (same).

Defendant also argues that Colombia is a substantively adequate alternative forum. *See* Motion at 7–10. On this subject, the *Piper Aircraft* Court stated:

In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. *Id. See also Lueck,* 236 F.3d at 1144 ("The effect of *Piper Aircraft* is that a foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."). Defendant argues that Colombia provides the remedies sought by Plaintiffs. In particular, Defendant argues that Plaintiffs "actually did bring a lawsuit in a Colombian court based on the same facts and raising substantially similar claims to those in this action." *See* Motion at 8. Moreover, Defendant argues, "not only were Plaintiffs able to pursue their claims in Colombia, they did so successfully." *See id.*

Plaintiffs have two responses to Defendant's assertions that Colombia is an adequate alternative forum: (1) claims brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 Note, are categorically immune from dismissal on the basis of forum non conveniens, *see* Opposition at 5–6; and (2) Columbia is not an adequate alternative forum because Plaintiffs would be risking personal harm in bringing their claims in a Colombian court and those courts would be unlikely to provide any redress, *see id.* at 9–17. As to this second argument, Plaintiffs have clarified that their contention is that the previous suit against the Colombian government *resulted* in the dangerous conditions precluding their ability to bring a suit against these Defendants in Colombia. *See* Plaintiffs' Supp. Brief at 11.

### a. Whether forum non conveniens applies to ATS and TVPA claims

Plaintiffs argue, on the basis of the legislative history for the TVPA, "that there is no basis for applying *forum non conveniens* to Plaintiff's claims." *See* Opposition at 5. However, the sections of legislative history cited by Plaintiffs make no mention of forum non conveniens. *See* Collingsworth Decl., Exs. A–B. Thus, while the Court agrees that Congress enacted the TVPA for the purpose of providing a civil cause of action for torture committed abroad, there are no statements that courts must entertain all TVPA claims regardless of forum non conveniens considerations.[2]

In addition, as argued by Defendant, the Ninth Circuit has previously stated that "limitations such as venue and the doctrine of forum non conveniens are available in [28 U.S.C.] § 1350 cases as in any other." *In re Estate of Ferdinand E. Marcos Human Rights Litig.,* 978 F.2d 493, 500 (9th Cir.1992). *See also Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 106 (2d Cir. 2000) (holding that the TVPA has not "nullified, or even significantly diminished, the doctrine of *forum non conveniens* ").

 Thus, the Court holds that it may address the applicability of forum non conveniens despite the presence of Plaintiffs' ATS and TVPA claims in the instant case.

### b. Plaintiffs would be risking personal harm by bringing a claim in a Colombian court

Plaintiffs argue that a "forum is inadequate if a plaintiff's life would be in danger were he or she to return to the foreign country to attempt to resolve the claim." *See* Opposition at 11. *See Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 14 (1st Cir.2000)

---

**2.** Since the ATS was enacted as part of the Judiciary Act of 1789, there is little available

legislative history. *See Sosa,* 124 S.Ct. at 2758.

(considering the plaintiffs' safety "relevant to the suitability of the proposed alternative forum"); *Aldana v. Fresh Del Monte Produce, et al.*, No. 01–3399, slip op. at 4 (S.D.Fla. Jun. 5, 2003) (finding that "a credible threat of retaliatory violence against Plaintiffs renders the Guatemalan forum insufficient as an adequate alternative forum")[3]; *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 336 (S.D.N.Y.2003) (finding the alternative forum to be inadequate because, in part, "the victim would be endangered by merely returning" to his home country); *Cabiri v. Assasie–Gyimah*, 921 F.Supp. 1189, 1199 (S.D.N.Y.1996) (finding the alternative forum to be inadequate because the plaintiff "would be putting himself in grave danger were he to return to Ghana to prosecute this action"); *see also Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir.2000) ("A foreign forum is available when the entire case and *all parties* can come within the jurisdiction of the forum.") (emphasis added). *Cf. Estate of Rodriquez v. Drummond Co., Inc.*, 256 F.Supp.2d 1250, 1267–68 (N.D.Ala.2003) (finding that the plaintiffs had adequately alleged the unavailability of remedies, for TVPA exhaustion purposes, because they would have been at risk of retaliation).

■ The Court agrees with Plaintiffs that an alternative forum is inadequate if the claimants cannot pursue their case without fearing retaliation. Under those conditions, the foreign alternative forum, in reality, would provide no available remedies for Plaintiffs' claims. *See Presbyterian Church*, 244 F.Supp.2d at 336; *Cabiri*,

921 F.Supp. at 1199 (discussing *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854, 861 (S.D.N.Y.1983)). In addition, the Court does not believe that there has to be an absolute certainty that Plaintiffs would be harmed if they returned: a significant possibility would be sufficient. *Cf. Immigration and Naturalization Service v. Cardoza–Fonseca*, 480 U.S. 421, 430–31, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (holding that, in order to establish that they "would be threatened" for purposes of asylum, the alien "must establish by objective evidence that it is more likely than not that he or she will be subject to persecution").

Defendant does not directly dispute Plaintiffs' position that if they were risking personal harm by bringing a case in Colombia, Colombia would not be an adequate alternative forum. However, it does challenge whether Plaintiffs would be in danger if they return, *see* Reply at 6–10, and whether Plaintiffs need to return to pursue their case, *see id.* at 6.

**c. Whether Plaintiffs would be in danger if they returned to Colombia**

Thus, the Court first examines both parties' evidence as to the conditions in Colombia and whether they present a dangerous environment to litigate this case. Since Defendant has the burden of demonstrating that there is an adequate alternative forum, the burden is on Defendant to show that a reasonably safe environment does exist.

■ Plaintiffs have submitted a substantial amount of evidence indicating that they would be in danger if forced to litigate in Colombia.[4] According to the 2003

---

3. *See* Plaintiff's Appendix ("App.") at 270.

4. Defendant has filed evidentiary objections to the evidence submitted by Plaintiffs. For a variety of reasons, Defendant argues that much of Plaintiffs' evidence would be inadmissible in court. However, this Court has

found no authority indicating that the evidence to be considered for a motion to dismiss for forum non conveniens must be admissible. In fact, the Court believes the opposite is true.

"As forum non conveniens doctrine seeks to protect defendants from litigation in an incon-

U.S. State Department Human Rights Report for Colombia, while the Colombian government generally respects the independence of the judiciary, "intimidation of judges, prosecutors and witness[es] was a serious problem." *See* App. at 12. The report states that "[j]udicial authorities were frequently subjected to threats and acts of violence." *Id.* The report also notes that, according to NGOs, sixteen human rights activists were killed and that regional ombudsmen in charge of safeguarding human rights were often threatened and have been killed in the past. *See id.* at 27–28. Robin Kirk, a former researcher for Human Rights Watch, states that "the residents of Santo Domingo willing to testify face serious threats to their lives and well-being for pursuing justice." *See* Kirk Decl. at ¶ 11. A 2002 report produced by Human Rights Watch adds that "a large number of prosecutors and investigators have been killed" due to their role in human rights cases. *See* App. at 79.

In his declaration, Plaintiff Luis Alberto Galvis Mujica states that he is currently living in Pittsburgh as a student at La Roche College. *See* Luis Alberto Galvis Decl. at ¶ 2. He claims that he "moved to the United States in September of 2002 in order to flee threats of imminent harm against [him] in Colombia." *Id.* After the Santo Domingo bombing, Luis Alberto Galvis claims that he began protesting against the Colombian military's involvement and was subsequently arrested by the Colombian army in retaliation. *Id.* at ¶¶ 4–5. After discovering the involvement of Defendants in the Santo Domingo bombing, Luis Alberto Galvis received threats against his life by paramilitary groups. *See id.* at ¶ 8. He thus left the area only to learn that another person who spoke out about the events in Santo Domingo was later killed in 2002. *See id.* Plaintiff Galvis also claims that other members of his family have received threats and been threatened by paramilitaries. *See id.* at ¶ 9. He also reports that his family has left (or are in the process of leaving) the country entirely and that several other families from Santo Domingo have moved to different areas of Colombia or have emigrated as well. *See id.* at ¶ 10.

Plaintiff Luis Alberto Galvis states that he had never considered filing a case in Colombia against Defendants because he and his family "firmly believe that we could never have survived to complete the case because we would be killed by either

venient forum, courts generally resist plaintiffs' motion for extensive discovery on the forum non conveniens question." Charles A. Wright, Arthur R. Miller & Edward H. Cooper § 3828, at 153 (Supp.2004). Since a determination regarding dismissal on the basis of forum non conveniens should be made early in the litigation and there will have been little discovery, the Court should not be restricted to considering only admissible evidence. *Cf. Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (because "the urgency of obtaining a preliminary injunction necessitates a prompt determination", the trial court may consider inadmissible evidence).

In its supplemental briefing, Defendant cites *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988), for the proposition that the Court should only consider admissible evidence in adjudication a motion to dismiss for forum non conveniens. *See* Defendant's Supp. Memo. at 18. In *Van Cauwenberghe*, the Supreme Court held that a denial of motion to dismiss on the ground of forum non conveniens is not an appealable collateral order. *Id.* at 527–30, 108 S.Ct. 1945. As to the evidence this Court may consider in these motions, the Supreme Court stated that "the district court's inquiry does not necessarily require extensive investigation", "may be resolved on affidavits", and that "the district court is accorded substantial flexibility in evaluating" such motions. *Id.* at 529, 108 S.Ct. 1945. None of these statements counter this Court's holding that it may consider inadmissible evidence.

the military or its paramilitary allies if we did so." *Id.* at ¶ 11. "This is so because the primary objective of the military and paramilitaries in Arauca is to protect Occidental, its interests and its pipelines." *Id.*

In his declaration, Tito Augusto Gaitan Crespo, a lawyer for a Colombian human rights organization, argues that a civil case against Defendant would be "very dangerous for the Santo Domingo victims." *See* Gaitan Decl. at ¶ 8. Gaitan also claims that other activists working to bring attention to the Santo Domingo case were killed. *See id.* at ¶¶ 10–11.

In her declaration, Luz Estella Nagle, a law professor and former Colombian judge, states that Plaintiffs could not bring this case in Colombia because "it is more than likely that the Plaintiffs in this case would be killed by one of the numerous armed groups in Arauca ... in retaliation for bringing a civil action against the powerful corporate Defendants ...." *See* Nagle Decl. at ¶ 8.

■ Defendant responds that Plaintiffs' previous litigation against the Colombian government regarding events in Santo Domingo indicate that they would be safe if they returned to pursue further litigation. *See* Reply at 7–9. Apparently, Defendant is arguing that if Plaintiffs survived previous litigation, Plaintiffs cannot assert that they would not survive again. But since Plaintiffs have clarified in their supplemental briefing that they first feared for their personal safety *after* they filed their initial case against the Colombian military, the Court holds that this inference does not sustain Defendant's burden. *But see PLM Int'l, Inc. v. Nath*, 1998 WL 514045 at \*1 (N.D.Cal. Aug. 17, 1998) (finding India to be an adequate alternative forum, in part, because the plaintiff had filed previous suits in India).

**i. Present residence of Santo Domingo victims**

However, to support its argument, Defendant "submitted evidence showing that the majority of the 59 residents of Santo Domingo who were victims of the alleged bombing and who actually testified in the Colombia proceedings are still residing Santo Domingo or the near vicinity." *See* Defendant's Supp. Memo. at 18. As support for this statement, Defendant has submitted a declaration from Pablo González, a security consultant working in Colombia, who hired private investigators to find the other individuals who brought suit against the Colombian government for the Santo Domingo bombing. *See* González Decl. at ¶ 5; Morales Decl., Ex. B at ¶ 5 (translation). Those investigators reported that 37 out of those 59 individuals still live in Santo Domingo and that several others live elsewhere in Arauca. *See* González Decl., Ex. A.

In response to this information, Plaintiffs have submitted the declaration of Daniel M. Kovalik, one of Plaintiffs' attorneys. According to his declaration, Kovalik traveled to Colombia in October 2004 and met with approximately fifty of the witnesses of the Santo Domingo bombing. *See* Kovalik Decl. at ¶ 2. He disputes some of the facts provided in the González report; he claims that nine of the individuals that González claims are living in Santo Domingo have left. *Id.* at ¶ 3. If Kovalik is accurate, approximately half of the individuals who brought suit against the Colombian government still remain in Santo Domingo (28 out of 59). Kovalik also argues that many of these individuals remain, not because they do not fear for their safety, but because "they are indigent peasant farmers, tied to the land with little or no resources to move elsewhere." *Id.* Defendant's evidence is consistent with this argument: out of the twenty-eight individu-

als that the parties do not dispute live in Santo Domingo, at least twenty-three work in agriculture. *See* González Decl., Ex. A.

On February 23, 2005, Plaintiff Mario Galvis filed a declaration with the Court indicating that he and his family have applied to enter Canada as refugees. *See* Galvis Decl. at ¶ 2. Mario Galvis claims that he and his son, John Mario Galvis, have been accepted as refugees and are awaiting relocation to Canada. *Id.* at ¶¶ 2–3. Until they leave, Plaintiff Mario Galvis claims that he and his son are "hiding for fear for our lives." *Id.* at ¶ 3. *See also* Supp.App. at 11–17 (Canadian visas and immigration documents for Mario Galvis and his son); *id.* at 18–26 (joint declaration of Nelson Enrique Galvis Mujica, Albeiro Galvis Mujica, Robert Yamith Galvis Mujica, and Oscar Andrey Galvis Mujica, with Canadian immigration documents).

The further information provided by Defendant regarding the present location of individuals who had previously sued the Colombian military for the Santo Domingo bombing is insufficient to meet its burden. The evidence submitted to the Court indicates that a substantial number of those plaintiffs (between one-third and one-half) have left Santo Domingo. Given the likely difficulty that many of these individuals would have in leaving the area, the Court is not persuaded that Defendant has shown that the forum is safe. Weighing this evidence against the backdrop of Plaintiffs' statements regarding conditions in Colombia and the other accounts provided, the Court does not believe that Plaintiffs can return to Colombia without running a substantial risk to their safety.

**d. Whether Plaintiffs must be present to bring their claims against Defendant**

Even if Plaintiffs were in danger, Defendant argues that Plaintiffs would not be required to make any personal appearances to bring a suit in Colombia. *See*

Reply at 6; Defendant's Supp. Memo. at 20–21. To support its argument, Defendant has offered the declaration of Fernando Hinestrosa, a law professor in Colombia and an Associate Justice of the Constitutional Court as well as the Supreme Court of Justice. *See* Hinestrosa Decl., Ex. 1 at 3–4; Morales Decl., Ex. F at 50 (translation). In his supplemental declaration, Hinestrosa offers three reasons why Plaintiffs would not have to be physically present in Santo Domingo to press their case against Defendants:

(1) Plaintiffs could file their case in Bogotá instead of Arauca;

(2) Pursuant to Colombian rules of civil procedure, Plaintiffs do not have to ever appear in court to bring a case; and

(3) With respect to testimony, Plaintiffs have the option of offering their statements before another judge in Colombia or, if they are overseas, making their statements through the Colombian consul or through a foreign judge (at the request of the Ministry of Foreign Relations).

*See* Hinestrosa Supp. Decl. at 9–10; Morales Supp. Decl. (Corrected) at 10 (translation).

Plaintiffs respond that Hinestrosa's claims are "misleading" and that they and other witnesses would have to return to Santo Domingo to offer their testimony. *See* Plaintiff's Supp. Brief at 12. Plaintiff offers the supplemental declaration of Luz Nagle to rebut the statements of Defendant's expert. Nagle first points out that Plaintiffs would likely be unable to obtain a lawyer in Colombia to file a complaint because the lawyer would also be in danger. *See* Nagle Supp. Decl. at ¶ 3. In addition, Nagle states that it is "not possible" for Plaintiffs to testify without appearing in court because Colombia is an "inquisitorial system" in which judges are responsible for examining witnesses. *Id.*

at ¶ 4. Under the Colombian system, even if a witness were to provide testimony outside of a Colombian courtroom, they would need to "ratify" that testimony before a judge in Colombia. *Id.* In a further supplemental declaration submitted to the Court, Hinestrosa disputes the interpretation of Colombian law offered by Nagle.

While there is substantial disagreement between the parties' experts regarding whether or not Plaintiffs' testimony can be offered in a trial, the Court believes that Defendant has established that Plaintiffs would be able to file their case in Colombia. The declaration provided by Luz Estelle Nagle disputes whether Plaintiffs' testimony could be provided outside of a Colombian court; it does not impact whether Plaintiffs could file a lawsuit against Defendants.

Since Plaintiffs would be able to file their case in Colombia, the Court holds that Plaintiffs' concerns as to their safety are more appropriately considered in the private interest factors analysis. *See Sarei v. Rio Tinto PLC,* 221 F.Supp.2d 1116, 1208 (C.D.Cal.2002) (stating that "plaintiffs' fears, while an appropriate consideration in assessing whether private interest factors favor a *forum non conveniens* dismissal, do not render [Papua New Guinea] an inadequate forum"); *see also In re Bridgestone/Firestone, Inc.,* 190 F.Supp.2d 1125, 1144 (S.D.Ind.2002) (considering the "political instability and violence in Colombia" in its private interest factors analysis). Several of the private interest factors discussed below touch on issues relating to the location of litigants and the availability of witnesses. Thus, Plaintiffs' safety concerns can be adequately addressed in that analysis.

**e. Colombian rules regarding past recovery for the same wrongful act**

However, the Court finds Colombia to be an inadequate forum for this litigation on another basis.

In its supplemental briefing, Defendant argues that Plaintiffs cannot challenge the adequacy of the alternative forum because they had obtained a judgment in Colombia and "Plaintiffs' recovery in its first action for the same alleged injuries is deemed *complete relief.*" *See* Defendant's Supp. Memo. at 17 (emphasis added). As support for its argument, Defendant has relied upon the opinion of its expert on Colombian law, Hinestrosa. In his supplemental declaration, Hinestrosa states the following regarding potential recovery against Defendant in Colombia:

> Full reparation of damage or loss is a fundamental principle in Colombian law. The victim must be fully indemnified, regardless of who caused the damage or loss, whether it was a single person or many persons, or a government agency or entity or a private party or entity. At the same time, it is a basic principle that the damage or loss can be repaired only one single time, namely that no one can collect and receive indemnification for the same damage or loss several times . . . .
>
> Consequently, if the Council of State upholds the decision of the administrative law court or Arauca, which issued a guilty verdict against the Government, the Ministry of Defense, and ordered that the plaintiffs be paid the amount of damages and losses claimed by them, as evidenced and substantiated during the proceedings, the satisfaction of that obligation will imply the full reparation of the victims, *who may not obtain any other indemnification from other parties.*

*See* Hinestrosa Supp. Decl., Ex. A at 8; Morales Supp. Decl. (Corrected) at 8–9 (translation) (emphasis added).

 While Defendant believes this argument supports a finding that Colombia is an adequate forum, the Court believes

that it proves the opposite. Hinestrosa's opinion is that these Plaintiffs will not be able to recover against these Defendants, even though these Defendants were not parties to the Colombian proceeding, if the existing Colombian ruling is left undisturbed. The unavailability of a remedy is a firmly established ground for finding that the alternative forum is *inadequate. See Piper Aircraft*, 454 U.S. at 255 n. 22, 102 S.Ct. 252 ("In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied."); *Lueck*, 236 F.3d at 1144 ("The effect of *Piper Aircraft* is that a foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."); *Ceramic Corp. of America v. Inka Maritime Corp. Inc.*, 1 F.3d 947, 949–50 (9th Cir. 1993) (finding the alternative forum inadequate because the plaintiff would "not be able to pursue any of its claims in Japan or obtain any relief in that forum"). If Plaintiffs "already have received complete recovery for their injuries through the Colombian court system", *see* Defendant's Supp. Memo. at 17, Colombia would be an inadequate forum because Plaintiffs could not obtain a remedy against Defendant as they could in this Court.[5]

The Court imagines Defendant will object this is not an "inadequacy" since it was Plaintiffs' fault for failing to pursue claims against both the Colombian military and Defendant in a single action. However, the Court bears in mind that it must focus on whether a "practical remedy" exists in the alternative forum, *see Lueck*, 236 F.3d at 1144; not whether it hypothetically exists. For example, in *Ceramic Corp.*, 1 F.3d at 949-50, the Ninth Circuit found that Japan was inadequate because the Japanese courts would give effect to forum selection clauses in the bills of lading at issue that would force the case to be litigated in Germany.[6] Even recognizing that "Japan has a sophisticated, well-developed legal system", the court held that there was no "potential avenue for redress" in that forum since Japanese courts would never hear the case on the merits. *Id.* at 949. In the course of its analysis, the Ninth Circuit did not conclude that because the plaintiff could have bargained for terms that excluded the forum-selection clause, Japan was hypothetically an adequate forum. Instead, it focused on the reality of the situation in holding that parties, taking them as the court found them, could not litigate the case in Japan. Similarly, the Court finds that Plaintiffs, given the successful nature of their previous litigation, cannot obtain a remedy in Colombia against these Defendants.

Thus, on this ground, the Court finds the alternative forum is inadequate. Since the existence of an adequate alternative forum in a necessary condition to dismiss, the Court DENIES Defendant's Motion to Dismiss on the basis of forum non conveniens.

Even though the Court could ends its forum non conveniens analysis at this point, it addresses the private and public interest factors below.

---

5. The Court recognizes that there is some contingency in this holding since the judgment could be reversed on appeal. However, if the Colombian courts are anything like those in the United States, the majority of lower court decisions are affirmed. Thus, it is quite possible that Plaintiffs will not be able to obtain a judgment against Defendant in Colombia.

6. The Ninth Circuit did not find that Germany was an inadequate forum but reversed and remanded the case so that the district court, which had focused on Japan, could address that question. *Id.* at 950.

### 3. Private interest factors

■ The Court holds that the private interest factors favor Plaintiffs.

#### a. Residence of parties and witnesses

Defendant argues that the residence of the majority of Plaintiffs and witnesses is Colombia. *See* Motion at 11–13. Potential witnesses include members of the Colombian military, eyewitnesses to the bombing in Santo Domingo, Colombian civil servants who investigated the bombing, physicians who treated the injured, and pathologists who examined the bodies recovered in Santo Domingo. *See id.*

Plaintiffs point out that Defendant Occidental Petroleum is located in Los Angeles. *See* Opposition at 18. Defendant Air-Scan is located in Florida. Plaintiff Luis Alberto Galvis currently lives in the U.S. (Pittsburgh) where he is living on a student visa. *See id.* at 19, 19 n. 13. Plaintiffs also argue that AirScan pilots and Occidental officials located in the United States would be important witnesses. *See id.* at 21.

On this factor, the Court does not focus "on the number of witnesses in each location" but rather the "materiality and importance of the anticipated witnesses' testimony." *See Gates Learjet,* 743 F.2d at 1335. The Court also bears in mind the increased speed and ease of modern travel and communication. *See id.* at 1336.

■ Defendants seeking dismissal on the basis of forum non conveniens need not "submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum." *Piper Aircraft,* 454 U.S. at 258, 102 S.Ct. 252. "Requiring extensive investigation would defeat the purpose of their motion." *Id.* But "defendants must provide enough information to enable the District Court to balance the parties' interests." *Id.* In *Piper Aircraft,* the Supreme Court held that suffi-

cient information was provided by defendants via two affidavits stating that it would call several categories of witnesses. *See id.* at 258–259, 259 n. 27. *See also Reid–Walen v. Hansen,* 933 F.2d 1390, 1396–97, 1397 n. 10 (8th Cir.1991) (holding that defendants must submit affidavits or information addressing which witnesses they would call to testify).

Initially, the Court had held that Defendant has not met its burden on this factor because it had not described with sufficient detail the relative importance of witnesses and what testimony they anticipate from them. However, along with its supplemental briefing, *see* Defendant's Supp. Memo. at 23–24, Defendant has filed the declaration of Kristin Linsley Myles, Defendant's counsel of record. That declaration provides more details about the categories of witnesses that Defendant would call if this case were to proceed to trial. *See* Myles Decl. at ¶ 2. These witnesses include: members of the Colombian military (including officers on the helicopter that allegedly bombed Santo Domingo and officers that were on the ground); former guerrillas that were allegedly engaged in battle against the Colombian military around Santo Domingo; civilian witnesses that lived in Santo Domingo at the time of the bombing (many of whom are listed in the declaration of Pablo González discussed above); Colombian civil servants that investigated the bombing of Santo Domingo; physicians that had treated individuals injured during the events in Santo Domingo; forensics experts; other plaintiffs in the previous proceeding against the Colombian military; and Plaintiffs themselves. *See id.* at ¶¶ 3–12. While the Court believes that some of these categories are redundant (for example, many of the civilian witnesses were also plaintiffs in the previous Colombian proceeding), the Court holds that Defendant would likely

call many Colombian witnesses to testify were this case to proceed to trial.

Plaintiffs are located in the United States and Canada. *See* Luis Alberto Galvis Decl. at ¶ 2; Mario Galvis Supp. Decl. at ¶ 3. Several of their family members are also currently living in Canada. *See* Supp. App. at 18–26 (Joint Declaration). For the reasons discussed in the previous section discussing their safety concerns, the Court does not believe that these Plaintiffs would be able to testify in open court were this case to return to Colombia.

Thus, the Court holds that this factor favors Plaintiffs. While a substantial number of the witnesses still reside in Colombia, Plaintiffs are key witnesses that would not be able to testify.

### b. Forum's convenience to litigants

Since Plaintiffs have chosen this forum, the Court will assume that it is convenient for them. Defendants are also both located in the United States, in Los Angeles and Florida.

The Court also bears in mind Plaintiffs' claims about the feasibility of litigation in Colombia given concerns about safety. Given those security considerations, this forum would be much more convenient.

Thus, the Court holds that this factor favors Plaintiffs.

### c. Access to physical evidence and other sources of proof

Defendant argues that "pertinent physical evidence and documents ... will be found in Colombia." *See* Motion at 11. Plaintiffs do not directly dispute Defendant's assertions.

While the Court believes some relevant documents may be in the possession of the American defendants, the Court holds that most of the physical evidence would be located in Colombia.[7]

---

7. The Court notes that some key physical evidence has been brought to the United States.

Thus, the Court holds that this factor favors Defendant.

### d. Whether unwilling witnesses can be compelled to testify

Defendant argues that the Court can neither exercise its subpoena power nor use letters rogatory. *See* Motion at 13–14. In particular, Defendant argues that Colombia is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters thus rendering this Court powerless to compel testimony. *See id.* at 14. Plaintiffs argue that they may use letters rogatory to secure depositions in Colombia. *See* Opposition at 20.

In *Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522, 536, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), the Supreme Court held that the Hague Convention "was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad." "[T]he text of the Evidence Convention, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad." *Id.* at 538, 107 S.Ct. 2542. In this decision, the Supreme Court cited with approval the decisions of Courts of Appeals that "the Convention cannot be viewed as the exclusive means of securing discovery transnationally." *Id.* at 538 n. 20, 107 S.Ct. 2542. Thus, the Court holds that the fact that Colombia is not a signatory to the Hague Convention does not foreclose the possibility of securing depositions abroad.

---

*See* App. at 48–54 (FBI analysis of bomb fragments found in Santo Domingo).

Rule 28(b) provides four ways in which a United States court can obtain depositions in a foreign country: (1) pursuant to a treaty or convention; (2) pursuant to a letter of request; (3) on notice before a person authorized to administer oaths in the place where the examination is held; and (4) before a person commissioned by the court. *See* Fed.R.Civ.P. 28(b). The procedure provided by Rule 28(b)(1) is a reference to the Hague Convention discussed in *Aerospatiale. See* 6 James Wm. Moore et al., Moore's Federal Practice § 28.11[1] (3d ed.1999). Pursuant to Rule 28(b)(2), "[l]etters of request, if honored by a foreign tribunal, provides compulsory process abroad."[8] *Id.* § 28.12[8]. However, "[s]ome countries do not provide compulsory process to summon witnesses, even to execute a letter of request." *Id.* "Drafters of Rule 28 caution that complying with its terms does not ensure completion of a foreign deposition." *Id. See also* Wright, Miller & Marcus § 2083, at 673 ("It is well, however, to realize that compliance with Rule 28(b), even as amended, will not insure completion of a deposition abroad. Examination of the law and policy of the particular foreign country involved, and consultation with the Department of State, is advisable."); *In re Bridgestone/Firestone*, 190 F.Supp.2d at 1141 n. 21 (noting that "the availability of compulsory testimony from non-party witnesses in Colombia is not assured").

Even if the Court could use letters rogatory on a compulsory basis, the Court acknowledges that the "procedure is expensive and time-consuming." *Torreblanca de Aguilar v. Boeing Co.*, 806 F.Supp. 139, 144 (E.D.Tex.1992). "In addition, conducting a substantial portion of a trial on deposition testimony precludes the trier of fact from its most important role; evaluating the credibility of the witnesses." *Id.*

Outside of the potentially compulsory methods, Defendant also argues that many Colombia witnesses, "including members of the Colombia Air Force, former FARC guerrillas, and the residents of Santo Domingo" would not voluntarily provide evidence to a United States court. *See* Motion at 14. In addition, Defendant argues that many Colombian witnesses would be unable to obtain a visa to testify in the United States. *See id.* at 15.

But Plaintiffs counter that many witnesses would be unwilling to testify in the foreign forum out of concern for their own safety. *See* Opposition at 21. For example, the Court finds it hard to believe that a Colombian court can readily compel a "former FARC guerrilla" to testify in open court. On this point, the 2003 State Department Human Rights report states that:

> According to the National Association of Judicial Branch Employees (ASONAL), numerous judicial branch employees received threats against their lives and some judges and prosecutors assigned to small towns worked out of departmental capitals because of security concerns.... On September 4[, 2003] in Bogota, *suspected FARC operatives killed a former prosecutor* who had been responsible for investigating the February bombing of the El Nogal social club [ ]. Witnesses, who were even more vulnerable to intimidation, often lacked

---

**8.** The procedures provided by Rule 23(b)(3) and (b)(4) do not provide compulsory process. "The notice method, unlike letters of request, generally does not embrace compulsory process." *Id.* § 28.13[1]. "The witness must appear voluntarily, unless the foreign state affords aid to the process." *Id.*

"A commission authorizes a person, either by name or descriptive title, to take a foreign deposition." *Id.* § 28.14[1]. "Discovery must be on a non-compulsory basis and pertain to commenced proceedings." *Id.*

faith in the Government's ability to protect them and refused to testify.

*See* App. at 12–13 (emphasis added). It does not seem that "it would be far easier to try this case in Colombia." *See* Motion at 15.

Indeed, it seems that this case would be difficult to try in almost any forum. However, the Court is skeptical whether Colombian courts would be practically able to compel unwilling witnesses to testify. And, as stated before, it is clear that Plaintiffs and many of their witnesses would be in danger if they took the witness stand. Even though this Court may have to use cumbersome methods to obtain some testimony, so would the Colombian courts with respect to these key witnesses. But the Court believes that the witnesses that could testify in open court in this forum are likely to be more important than those witnesses that could testify in Colombian courts.

Thus, the Court holds that this factor favors Plaintiffs.

### e. Cost of bringing witnesses to trial

This factor turns on the extent to which witnesses must be transported from Colombia to the United States. If Defendant is correct that it would have to present many Colombian witnesses at trial, this cost could be high. However, the Court recognizes that there will be some American witnesses and that the cost of air travel is not overwhelming. Defendant states that an average round-trip economy ticket from Bogota to Los Angeles costs $659. *See* Motion at 17. While these ticket prices are higher than most domestic flights, the Court does not consider this to be an important private interest factor given that the other costs of this action would certainly dwarf this slight difference.

### f. Enforceability of the judgment

Neither party addresses this factor. However, the Court holds that this factor favors Plaintiffs.

As the Defendant in the current action is an American company, it would be easier for a United States court to enforce a potential judgment against them than a Colombian court.

Thus, this factor favors Plaintiffs.

### g. All other practical problems

Defendants present two practical problems under this heading: (1) cost and delay of translation services; and (2) ability to view the scene at Santo Domingo. *See* Motion at 18–19.

The Court recognizes that translation imposes significant costs and delays on both the parties and the Court. A number of documents produced for this initial motion needed translation. The Court holds that this consideration favors Defendant.

However, the Court is skeptical that a jury would need to view the scene at Santo Domingo to decide the case. While the location of FARC guerrillas relative to Colombia Armed Forces and Santo Domingo is critical, nothing *currently* located at the scene would tend to indicate where these entities were in 1998. In addition, topography may be relevant to what Colombian Air Force personnel could see from helicopters but such evidence may be provided through models or photographs. Thus, the Court holds that this consideration does not favor Defendant.

### h. Ability to implead third-party defendants

Even though not part of the formal private interest factors, the Court will here discuss the issue of impleading potential third-party defendants argued by the parties.

Defendant argues that the Court should dismiss this case because they are unable to implead the Colombian government due to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq. The Supreme Court has held that "problems

posed by the inability to implead potential third-party defendants clearly support[ ] holding the trial" in the foreign forum. *See Piper Aircraft,* 454 U.S. at 259, 102 S.Ct. 252.

For the purpose of this argument, the Court will assume that Defendant could not implead the Government of Colombia in this litigation. However, as the basis for finding that Colombia is an inadequate forum, the Court held that Plaintiffs cannot obtain a remedy against Defendant at the present time. Thus, whether Defendant could implead the Colombian government in a Colombian action is a moot point.

### 4. Public interest factors

The Court holds that the public interest factors slightly favor Defendant.

#### a. Local interest of lawsuit

Defendant sensibly argues that there is great local interest in Colombia because the events central to this litigation took place in Colombia. *See* Motion at 20–21. However, the Court believes that the United States has an interest in the Santo Domingo bombing. The Court agrees with Plaintiffs that the United States has an interest because the Defendants are American corporations and the Colombian Air Force unit allegedly involved may have received American military aid. *See* App. at 300–02.

Despite the presence of a significant American interest in the lawsuit, the Court holds that Colombia has a stronger local interest in this litigation. Thus, this factor favors Defendant.

#### b. The court's familiarity with governing law

Defendant argues that Colombian law would apply in the instant case and that this Court is not familiar with Colombian law. *See* Motion at 22–23. Since the Court, in its simultaneously filed order, dismisses Plaintiffs' state law claims,

whether the Court would have to apply Colombian law is moot.

#### c. Burden on local courts and juries

Defendant argues that a Los Angeles court and jury should not be burdened with deciding this litigation. *See* Motion at 21–22 (citing *Alfadda v. Fenn,* 159 F.3d 41, 46–47 (2d Cir.1998)). Plaintiffs argue that Congress' enactment of the TVPA would obviate any potential burden on local courts and juries. *See* Opposition at 23.

As to the burden on juries, this factor significantly overlaps with "local interest." The *Alfadda* court's concern was that juries would be sitting "on cases with no relevance to their own community." 159 F.3d at 46. As mentioned above, the Court holds that Colombia has a greater local interest. As to the burden on courts, the Court agrees with Plaintiffs. In enacting the TVPA, Congress must have imagined that cases involving events occurring outside the United States would be tried in federal courts.

However, given the burden on juries, the Court holds that this factor favors Defendant.

#### d. Congestion in the court

Neither party argued this factor.

#### e. The costs of resolving a dispute unrelated to this forum

Neither party argued this factor.

#### f. The impact of the Statement of Interest

Defendant argues that the Statement of Interest "clearly indicates that the U.S. has no formal interest in having this case adjudicated in its courts." *See* Defendant's Supp. Memo. at 22. While Defendant does not point to any case law indicating that similar Statements of Interest bear on the public interest factors analysis, the Court agrees that the potential impact

of this case on our foreign policy interests is properly considered. However, the Court will do so in the course of its international comity discussion, as well as its other order addressing the act of state and political question doctrines.

### 5. Choice of law determination

██ "[T]he choice of law analysis is only determinative when the case involves a United States statute requiring venue in the United States, such as the Jones Act or the Federal Employers' Liability act." *Lueck*, 236 F.3d at 1148. "Where no such law is implicated, the choice of law determination is given much less deference on a forum non conveniens inquiry." *Id.*

In the instant case, there is no federal statute that requires venue in the United States. Thus, the Court holds that this determination has little bearing on its decision regarding forum non conveniens.

### 6. Defendant's residence in this forum

Plaintiffs argue that the residency of Defendant Occidental Petroleum in Los Angeles is a separate issue weighing against dismissal. *See* Opposition at 18–19. *See Ravelo Monegro*, 211 F.3d at 513 (commenting that "foreign plaintiffs typically bring such suits in the quintessentially convenient forum for the defendant— the defendant's home forum"). Courts have stated that in the "unusual situation, where the forum resident seeks dismissal, this fact should weigh strongly against dismissal." *Reid–Walen*, 933 F.2d at 1395. *See also Lony*, 935 F.2d at 608 (making similar observation).

██ While *Reid–Walen* holds to the contrary, the Court agrees with Defendant that *Piper Aircraft* suggests that Defendant's residence is not a factor. *See* Reply at 17. In that case, the Court did not find that the movant's residence in that forum was a factor weighing against forum non

conveniens. *But cf. Stangvik v. Shiley Inc.*, 54 Cal.3d 744, 760, 1 Cal.Rptr.2d 556, 819 P.2d 14 (1991) (finding a "presumption of convenience" in California where the defendant was incorporated and had its principal place of business in California).

### 7. Summary

To summarize, the Court holds that Colombia is an inadequate alternative forum for this litigation. If the Court had found that Colombia was an adequate forum, the Court would refuse to dismiss on the basis of forum non conveniens because the private interest factors favor Plaintiffs and the public interest factors favor Defendant. While foreign plaintiffs should receive less deference in this analysis, the Court finds that Defendant has not shown a sufficiently serious inability to pursue this case in this Court. Even though the circumstances surrounding this case would be difficult, the Court bears in mind that forum non conveniens does not require Plaintiffs to choose the "optimal forum" for their case. *See Dole Food*, 303 F.3d at 1118.

## III. International comity

### A. Legal standard

 "In the legal sense, comity: is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *In re Simon*, 153 F.3d 991, 998 (9th Cir.1998) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). "But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.* (quoting *Hilton*, 159 U.S. at 164, 16 S.Ct. 139).

"Under this doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise the jurisdiction they otherwise have." *Sarei*, 221 F.Supp.2d at 1199.

" 'Comity is a recognition that which one nation extends within its own territory to the legislative, executive, or judicial acts of another.' " *In re Grand Jury Proceedings, Yanagihara Grand Jury, Impanelled, June 13, 1988*, 709 F.Supp. 192, 195 (C.D.Cal.1989) (Rea, J.) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971)). "It is 'an essentially voluntary deference to the acts of other governments, undertaken for the common good even though no transnational institution exists to exert any compulsion.' " *Id.* (quoting 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4473 (1981)). *See generally* Restatement (Third) of Foreign Relations Law § 403 (1987) (listing factors considered when evaluating international comity).[9]

■ "The party asserting the applicability of the comity doctrine bears the burden of proof." *Sarei*, 221 F.Supp.2d at 1200 (citing *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993)).

### B. Application to the Instant Case

■ Defendant argues that the doctrine of international comity compels the dismissal of this action.[10] *See* Motion at 23. International comity "is an abstention doctrine: A federal court has jurisdiction but defers to the judgment of an alternative forum." *Ungaro–Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th

Cir.2004). "Abstention doctrines are prudential doctrines and this court is not obligated under American statutory law to defer to foreign courts." *Id.* at 1238 n. 13.

### 1. The existence of a "true conflict"

Plaintiffs argue that there are no grounds for dismissal on this basis due to the lack of "legislative acts, or legal decision that even might conflict with this Court's exercise of jurisdiction of this matter." *See* Opposition at 24. The Court agrees that, at least in the Ninth Circuit, the application of international comity is generally limited to cases where there is a "true conflict" between domestic and foreign law. *See In re Simon*, 153 F.3d at 999; *see also United International Holdings, Inc. v. Wharf Holdings Ltd.*, 210 F.3d 1207, 1223 (10th Cir.2000) ("In general, we will not consider an international comity or choice of law issue unless there is a 'true conflict' between United States law and the relevant foreign law."); *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1049 (2d Cir.1996) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction.").

■ In *Sarei*, Judge Morrow discussed whether the existence of a "true conflict" is a threshold requirement for abstention on international comity grounds. 221 F.Supp.2d at 1200–01. While Judge Morrow noted that "the matter is not free from doubt", she would "assume that such a threshold requirement exists." *Id.* at 1201. This Court believes that, given the Ninth Circuit's decision in *In re Simon*, it must treat the existence of a "true conflict" as a threshold requirement.

---

9. In *In re Grand Jury Proceedings,* this Court cited an earlier version of the Restatement of Foreign Relations Law with approval.

10. The Court notes that, in some circumstances, a stay instead of a dismissal may be

appropriate. *See Turner Entertainment Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1523 (11th Cir.1994) (holding that, pursuant to the doctrine of "international abstention", "the appropriate resolution is a stay rather than a dismissal of the American action").

### a. What is a "true conflict"

In *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 794–95, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Supreme Court considered whether the Sherman Antitrust Act could apply to British reinsurers. These foreign reinsurers asserted that the principle of international comity barred the district court's jurisdiction over them. *Id.* at 797, 113 S.Ct. 2891. The Court held that, in the particular circumstances presented in *Hartford Fire*, the only substantial international comity issue was "whether 'there is in fact a true conflict between domestic and foreign law.'" *Id.* at 798, 113 S.Ct. 2891 (quoting *Aerospatiale*, 482 U.S. at 555, 107 S.Ct. 2542 (Blackmun, J., concurring in part and dissenting in part)).

The British reinsurers argued that there was a conflict because the British "Parliament ha[d] established a comprehensive regulatory regime over the London reinsurance market and that the conduct alleged here was perfectly consistent with British law and policy." *Id.* at 798–99, 113 S.Ct. 2891. However, the Court held that "this is not to state a conflict." *Id.* at 799, 113 S.Ct. 2891. "No conflict exists, for these purposes, 'where a person subject to regulation by two states can comply with the laws of both.'" *Id.* (quoting Restatement (Third) Foreign Relations Law § 403, Comment e). "Since the London reinsurers do not argue that British law requires them to act in some fashion prohibited by the United States, or claim that their compliance with the laws of both countries is otherwise impossible, we see no conflict with British law." *Id.* (citations omitted). Thus, *Hartford Fire* indicates that a "true conflict" is more than a mere inconsistency. *See Metro Industries, Inc. v. Sammi Corporation*, 82 F.3d 839, 847 n. 5 (9th Cir.1996) ("A foreign country's allowing or even encouraging particular conduct which is prohibited in the United States no longer provides a sufficient basis for finding a conflict between foreign and domestic law.").

■■■ In the instant case, the Court finds that there is no "true conflict." Since the Court has not made any findings of liability or provided any remedies, there is no *present* conflict between the Court's proceeding with the instant case and any proceedings in Colombia. In other words, there is no reason to believe that Defendant could not comply with an order or judgment of this Court. *See In re Grand Jury Proceedings*, 40 F.3d 959, 964 (9th Cir.1994) ("A party relying on foreign law to contend that a district court's order violates principles of international comity bears the burden of demonstrating that the *foreign law bars' compliance with the order.*") (emphasis added); *In re Grand Jury Proceedings*, 873 F.2d 238, 239–40 (9th Cir.1989) (same).

However, the Court acknowledges that there is the possibility of an inconsistency between a future, potential judgment of this Court and a judgment of a Colombian court. *See* Defendant's Supp. Memo. at 14 (citing *Eastman Kodak Co. v. Kavlin*, 978 F.Supp. 1078, 1088–90 (S.D.Fla.1997)). While the Court recognizes that Defendants were not parties to any Colombian court action, the instant litigation will touch on the participation of the Colombian military and government in the events at Santo Domingo. That participation has been litigated in Colombia and, on May 20, 2004, Plaintiffs obtained a judgment against the Colombian military. *See* Alwood Decl., Exs. A–B. After that judgment, both parties appealed the lower court's decision. *See* Morales Decl., Ex. D. If the Court exercises its jurisdiction over the instant case, there is the possibility that a finding of fact or a legal ruling would conflict with those made by a foreign court. *See Turner Entertainment*, 25

F.3d at 1521 (observing that "the prospect of 'dueling courts,' conflicting judgments, and attempts to enforce conflicting judgments raise major concerns of international comity"); *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 939 (D.C.Cir.1984) ("Comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action, allowing res judicata to be pled in defense.").

To address this concern, the Court believes it should discuss another, related doctrine—international abstention.

## 2. International abstention

The potential of conflicting findings is more properly characterized as raising the issue of international abstention rather than international comity. While there is substantial overlap between these two doctrines, international abstention is more focused on parallel judicial proceedings.

■■■ "The international abstention doctrine allows a court to stay or dismiss an action where parallel proceedings are pending in the court of a foreign nation." *Supermicro Computer, Inc. v. Digitechnic, S.A.,* 145 F.Supp.2d 1147, 1149 (N.D.Cal. 2001) (citing Schwarzer, et al., Federal Civil Procedure Before Trial, ¶ 2:1326.4 (2000)). The international abstention doctrine "allows a court to abstain from hearing an action if there is a first-filed foreign proceeding elsewhere." *Id.* In the course of this opinion, Judge Legge also noted that the international abstention doctrine had been adopted by the Eleventh and Seventh Circuits in *Turner Entertainment* and *Finova Capital Corp. v. Ryan Helicopters, U.S.A. Inc.,* 180 F.3d 896 (7th Cir.1999). Even though not discussed in *Supermicro,* the Ninth Circuit has also spoken to this issue.[11]

In *Neuchatel Swiss General Insurance Co. v. Lufthansa Airlines,* 925 F.2d 1193, 1194 (9th Cir.1991), the Ninth Circuit considered whether a district court properly entered an order staying an action pending the outcome of parallel judicial proceedings in Geneva, Switzerland. The Ninth Circuit reversed the district court's order because it had not properly applied the framework provided by *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). *Id.See also Turner Entertainment,* 25 F.3d at 1518 (observing that federal courts have taken two approaches to these situations, both lifting criteria for concurrent proceedings in federal and state courts but placing different emphases on the international comity concerns). In *Neuchatel,* the Ninth Circuit held that "the fact that the parallel proceedings are pending in a foreign jurisdiction rather than in a state court is immaterial" and "reject[ed] the notion that a federal court owes greater deference to foreign courts than to our own state courts."[12] 925 F.2d at 1195. *See also*

---

11. The *Supermicro* court ultimately did not decide whether it should stay or dismiss the action on the basis of international abstention. That court held that "defendant's motion [could] be resolved by considering the discretionary nature of the jurisdiction of this court under the Declaratory Judgment Act." *Id.* at 1150.

12. The Ninth Circuit did not explain why it believed that there was no significant difference between a parallel foreign proceeding rather than a parallel state court action. One motivation for the *Colorado River* doctrine is that "requiring federal court dismissal would give litigants a powerful tool to keep cases out of federal court or remove cases to state court simply by filing a parallel suit in state court." Erwin Chemerinsky, Federal Jurisdiction § 14.2, at 762 (2d ed.1994). This concern would have just as much force in the international context: if the existence of a concurrent foreign proceeding were sufficient to bar federal court jurisdiction, that would frustrate

*Finova,* 180 F.3d at 898–900 (applying the *Colorado River* factors).

As *Neuchatel* instructs, the Court applies the *Colorado River* doctrine to the instant case.

### a. Application of *Colorado River* principles

■■■ Under the *Colorado River* doctrine, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." 424 U.S. at 813, 96 S.Ct. 1236. The doctrinal starting point for the *Colorado River* doctrine is the principle that federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Id.* at 817, 96 S.Ct. 1236. Under this doctrine, a district court may decline to exercise jurisdiction only in exceptional circumstances that are based on considerations of "[wise] judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)).

■■■ A federal court considers six factors in deciding whether or not to apply *Colorado River:* (1) whether either court has assumed jurisdiction over a *res;* (2) the relative convenience of the forums; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; and (6) whether the state proceeding is adequate to protect the parties' rights.[13] *See Nakash v. Marciano,* 882 F.2d 1411, 1415 (9th Cir.1989). These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a mechanical checklist. *See id.*

■■■ However, the Court does not need to undertake this multi-factor analysis. Relying on *Moses H. Cone v. Mercury Const. Corp.,* 460 U.S. 1, 28, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Ninth Circuit has held that "the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a stay." *Intel Corp. v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 913 (9th Cir.1993). While the instant case involves a Colombian judgment instead of a state court, the disposition of the Colombian proceeding would not resolve this action because Defendant is not a party to that foreign action. Thus, the resolution of Plaintiffs' case in Colombia, while likely impacting many of the important facts in this case, will not resolve Plaintiffs' case against these Defendants.

In *Intel,* the Ninth Circuit considered whether the district court properly granted a stay in a copyright infringement ac-

the ability of federal courts to adjudicate cases involving American law. The existence of concurrent foreign proceedings will likely become much more common. *See* Margarita Trevino de Coale, *Stay, Dismiss, Enjoin or Abstain?: A Survey of Foreign Parallel Litigation in the Federal Courts of the United States,* 17 B.U. Int'l L.J. 79, 80 (1999) ("Parallel litigation occurs increasingly often today as a result of an unprecedented expansion of transnational activities and a resulting increase in international business disputes."). Given the explicitly extraterritorial nature of Plaintiffs' federal claims pursuant to the Alien Tort Statute and the Torture Victim Protec-

tion Act, that potential outcome would be especially problematic.

**13.** The Court notes that the fact that Defendant is not a party to any proceeding brought by these Plaintiffs in Colombia is not a dispositive factor. For the *Colorado River* doctrine to be applied, "exact parallelism" is not required: "It is enough if the two proceedings are 'substantially similar.'" *See id.* at 1416. Since the Court has other dispositive grounds for finding that the *Colorado River* doctrine would not bar this suit, the Court assumes, but does not hold, that the instant case is sufficiently similar to Plaintiffs' case in Colombia.

tion brought by plaintiff Intel against defendant Advanced Micro Devices, Inc. ("AMD"). *Id.* at 910–12. AMD believed that Intel breached the contract by failing to allow it to produce Intel processors and, pursuant to an arbitration provision in the contract, successfully compelled arbitration upon filing a petition in state court. *Id.* at 910–11. Just before the end of the five year arbitration proceeding, Intel then brought suit in federal court alleging that AMD had infringed its copyright by producing processors based on Intel's technology. *Id.* at 911. Subsequent to the filing of the federal case, the arbitrator issued his ruling. *Id.* In that ruling, the arbitrator ruled for AMD and found that AMD had the right to manufacture processors based on Intel's designs. *Id.* The state superior court confirmed the arbitration award and Intel appealed. *Id.* at 912. At that time, AMD moved the district court for summary judgment or, in the alternative, for a stay. *Id.* Giving rise to the appeal before the Ninth Circuit, the district court granted AMD's motion for a stay. *Id.*

The *Intel* court found that all of the issues in the federal court would only be resolved if the arbitration award was confirmed, while the copyright issues would not be resolved if the award were overturned. Thus, the further appeals taken in the California state court system would not conclusively resolve the claims remaining in the federal district court. Similar to *Intel,* the resolution of the foreign proceeding would not conclusively resolve the claims brought by Plaintiffs in this Court. If the Colombian judgment is reversed on appeal, finding, for example, that the Santo Domingo bombing never occurred then the present case against Defendants would be moot. However, if the Colombian judgment was affirmed in all respects, one would imagine that Plaintiffs could pursue the instant action without forcing this Court to reach any conclusions inconsistent with the Colombian judiciary. Therefore, the Court may not dismiss or stay Plaintiffs' case due to the existence of a foreign parallel proceeding.[14]

### 3. The international character of the instant case

While the *Neuchatel* court paid no particular deference to foreign courts, this Court wishes to emphasize that it is well aware of the particular circumstances of this case.[15]

In its moving papers, Defendant argues that the interests of Colombia and the United States in this case weigh in favor of the application of international comity. The Court does not deny that Colombia's interest is particularly substantial since Plaintiffs have alleged that the Colombian military was involved in the Santo Domingo bombing. *See* Motion at 24. However, Defendant's authority for this particular argument are cases that apply the act of state doctrine. *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 436, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Friedar v. Government of Israel,* 614 F.Supp. 395, 398 (S.D.N.Y.1985).

---

**14.** The Court notes that this holding dovetails with the "true conflict" generally required for international comity to bar federal jurisdiction. While there is the possibility of a conflict, it is not certain. This uncertainty undercuts a finding that there is an inevitable "true conflict" between domestic and foreign courts.

**15.** While this was not an explicitly important element of the *Neuchatel* court's analysis, the Court notes that *Neuchatel* involved "an ordinary commercial dispute over the loss of cargo." 925 F.2d at 1194.

As Defendant has separately argued in its motion to dismiss that the Court should abstain from exercising its jurisdiction on the basis of the distinct act of state doctrine, the Court believes that it can account for the unique international character of this action its separate order regarding Defendant's motion to dismiss.

### 4. Retrospective vs. prospective application of the doctrine of international comity

Defendant principally argues that international comity should apply on the basis of the Eleventh Circuit's decision in *Ungaro–Benages v. Dresdner Bank AG*, 379 F.3d 1227 (11th Cir.2004). *See* Reply at 24–25. Specifically, Defendant argues that while Plaintiffs may be correct about a retrospective application of the doctrine, this suit should be dismissed on a prospective application of international comity. *See id.*

"When applied retrospectively, domestic courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings." *Ungaro–Benages*, 379 F.3d at 1238. "When applied prospectively, domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum." *Id.* "Applied prospectively, federal courts evaluate several factors, including the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum." *Id.*

In *Ungaro–Benages*, the plaintiff brought a suit against two German banks to recover assets that were stolen from her family in Nazi Germany via a program of "Aryanization" during the 1930s and 1940s. 379 F.3d at 1229–30. Plaintiff did not learn of her family's history until 2001 and

thereafter brought a claim against the defendants. *Id.* at 1230–31. Before her lawsuit began, during the 1990s, many class action lawsuits had been filed against the German government and German companies by individuals like the plaintiff whose families had lost their assets during the Nazi reign in Germany. *Id.* at 1231. In reaction to those mounting lawsuits, the German government approached the United States in an effort to stem the litigation. *Id.* In 2000, the United States entered into the "Foundation Agreement" with Germany which established a private foundation to hear claims brought by victims of the Nazi regime. *Id.* The Foundation was voluntarily funded by the German government and German companies and would provide some compensation to those individuals who would have otherwise sued those entities in a federal court. *Id.* Pursuant to the Foundation Agreement, the United States agreed to encourage federal courts to treat the Foundation as the exclusive forum for suits arising out of the Nazi regime by filing a Statement of Interest in any lawsuit involving those events. *Id.* Those statements informed the courts that "it is in the foreign policy interests of the United States for the case to be dismissed on any valid legal ground but not suggest that the agreement itself provides an independent legal basis for dismissal." *Id.* at 1232.

Analyzing the case under the prospective vein of international comity, the Eleventh Circuit found that all three factors favored dismissing the suit. As to the interests of the United States, the court found that the federal government had "consistently supported the Foundation" and, through the course of his negotiations, the President "determined that the interests of American citizens, on the whole, would be best served by establishing the Foundation Agreement." *Id.* at 1239. As to the interests of Germany, the

court found that it had "a significant interest in having the Foundation be the exclusive forum"—the significant interest presumably being the avoidance of further class action litigation. *Id.* As to the adequacy of the alternative forum, the court found that the procedures of the Foundation were flexible for the purpose of accommodating the reparation claims and would be able to provide an adequate remedy. *Id.See also In re Nazi Era Cases Against German Defendants Litigation,* 129 F.Supp.2d 370, 386–88 (D.N.J.2001) (finding that the plaintiff's case arising out of his forced labor in Nazi Germany should be dismissed on the basis of international comity in favor of the Foundation process).[16]

### a. The strength of the United States' interest

The United States has a substantial interest in the present case. A Supplemental Statement of Interest of the United States was recently filed by the State Department on December 30, 2004.

The Supplemental Statement relevantly states the following:

> The Department believes that foreign courts generally should resolve disputes arising in foreign countries, where such courts reasonably have jurisdiction and are capable of resolving them fairly. An important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses. Duplicative proceedings in U.S. courts second-guessing the actions of the Colombian government and its military officials and the findings of Colombian courts, and which have at least the potential for reaching disparate conclusions, may be seen as unwarranted and intrusive to the Colombian gov-

ernment. Moreover, it may also be perceived that the U.S. Government does not recognize the legitimacy of Colombian judicial institutions. These perceptions could potentially have negative consequences for our bilateral relationship with the Colombian government.

In *Ungaro–Benages,* 379 F.3d at 1239, the Eleventh Circuit held that the United States had a strong interest in using the Foundation established by agreement between the U.S. and Germany. As evidence of this interest, the court stated that the "United States Government has consistently supported the Foundation as the exclusive forum for the resolution of litigation against German corporations related to their acts during the National Socialist era." *Id.*

The Supplemental Statement filed by the State Department in this case is similar strong evidence that the United States, in the interest of preserving its diplomatic relationship with Colombia, prefers that the instant case be handled exclusively by the Colombian justice system. *See also Sarei,* 221 F.Supp.2d at 1192 (finding no authority where the court proceeded against the State Department's opinion that there would be a negative impact on U.S. foreign relations). *Cf. Sosa,* 124 S.Ct. at 2766 n. 21 (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 2255, 159 L.Ed.2d 1 (2004) (with respect to foreign sovereign immunity, stating that "should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opin-

---

**16.** In *Ungaro–Benages,* the Eleventh Circuit did not discuss the existence of a "true conflict." However, one could conclude that liti-

gation would directly conflict with the German Foundation, a foreign administrative body. *See id.* at 387.

ion might well be entitled deference as the considered judgment of the Executive on a particular question of foreign policy") (emphases in original).

However, the Court notes that the instant case involves a different circumstance than *Ungaro–Benages*. In *Ungaro–Benages*, the Eleventh Circuit examined a situation in which the President of the United States negotiated the Foundation Agreement with the government of Germany to establish an alternative forum for the *sole purpose* of handling reparations claims arising out of the Nazi regime. The Foundation Agreement (and the Statements of Interest filed pursuant to that Agreement) "vividly demonstrate that a commitment has been made by the Executive branch to resolve claims ... on an intergovernmental level." *In re Nazi Era Cases Against German Defendants Litigation*, 129 F.Supp.2d at 388. "This is in keeping with almost six decades of treaties and agreements that have been orchestrated by the political branches of government, and committed to Germany for implementation." *Id.* See also *Ungaro–Benages*, 379 F.3d at 1230–31 (detailing this history). While this Court still finds that the United States has a substantial interest in this case, the Court does believe that this interest is as significant as the American interest in the Foundation Agreement.[17]

**b. The strength of Colombia's interest**

Attached to the Supplemental Statement of Interest, the State Department has forwarded a letter from the Colombian Ministry of Foreign Relations regarding this litigation. The translation of the March 12, 2004 letter states simply: "The Ministry of Foreign Affairs wishes to add that the Government of Colombia is of the opinion that any decision in this case may affect the relations between Colombia and the US."

While the Colombian government provided little explanation as to why this is true for this particular case, the Court does not believe the Colombian government has to explain itself to a federal court. Thus, the Court finds that Colombia has a strong interest in preventing this Court's jurisdiction over the instant case.

However, the Court holds that the strength of Colombia's interest is less than has been found in other cases addressing international comity. In *Sarei*, the Papua New Guinea government had enacted the Compensation Act which explicitly limited the ability of its citizens to pursue claims in foreign courts arising out of mining and oil drilling projects—exactly the kind of suit that the plaintiffs had brought in that case. 221 F.Supp.2d at 1201–04. In *Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582, 583–84 (2d Cir.1993), the Indian government had enacted legislation, the Bhopal Gas Leak Disaster (Processing of Claims) Act, that provided the Indian government with the sole right to represent the victims of the Bhopal disaster in all courts around the world—thus eliminating the standing of the plaintiffs to bring suit in that case. In these two instances, the foreign governments had, like the United

---

**17.** In addition, the United States, via the legislative enactment of the Alien Tort Statute and the Torture Victim Protection Act, arguably has an interest in seeing the instant case proceed. *See Presbyterian Church*, 244 F.Supp.2d 289, 342–343 (S.D.N.Y.2003) (holding that "granting comity to allegedly genocidal acts violates the strong United States interest in addressing jus cogens violations through the ATCA"); *cf. Wiwa*, 226 F.3d at 106 (the enactment of the TVPA "communicated a policy that such suits should not be facilely dismissed on the assumption that the ostensibly foreign controversy is not our business").

States with respect to the Foundation Agreement, taken explicit, targeted steps to address the situation giving rise to the litigation in the federal courts. Here, the Colombian government is not a party to the instant action and has not taken any legislative steps to limit the ability of its citizens to pursue suits involving the key events.

### c. Adequacy of the alternative forum

As Plaintiffs argued during the hearing on this motion, the Court must consider the adequacy of the alternative forum in its international comity analysis. *See Ungaro–Benages*, 379 F.3d at 1238; *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) ("When a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation . . ."). Plaintiffs assert that "the adequacy of the forum is a *prerequisite* to applying the international comity doctrine." *See* Plaintiffs' Supp. Reply at 7 (emphasis added) (citing *Presbyterian Church*, 244 F.Supp.2d at 343).

The Court agrees with Plaintiffs. In *Hilton*, the Supreme Court first considered the doctrine of international comity in deciding whether to enforce a judgment rendered in France upon U.S. citizens. After a rather exhaustive review of existing authority, the Supreme Court considered the extent to which the courts of the United States should defer to the judgment of foreign courts:

> In view of all the authorities upon the subject . . . we are satisfied that *where there has been an opportunity for a full and fair trial abroad* before a court of competent jurisdiction . . . under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and *there is nothing to show either prejudice in the court,* or in the systems of laws under which it was sitting, or *fraud in procur-*

> *ing the judgment,* or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

159 U.S. at 202–03, 16 S.Ct. 139 (emphases added). Put more simply, federal courts will not review foreign judgments unless the parties challenging that judgment demonstrate that it was unfair. While the instant case does not involve a judgment against either Plaintiffs or Defendants, a similar principle of fairness should guide the Court in deciding whether to dismiss this case on grounds of international comity. *See Turner Entertainment*, 25 F.3d at 1520 (for purposes of international comity, examining whether the foreign "legal system clearly follows procedures that ensure that litigants will receive treatment that satisfies American notions of due process").

■ If a court may disregard a foreign judgment that is obtained through fraud or that failed to abide by principles of due process, similarly courts should not yield in favor of fora that will offer litigants no legitimate prospect of recovery. Thus, the Court holds that the existence of an adequate alternative forum, as with forum non conveniens, is a *necessary* condition to apply the doctrine of international comity.

■ As the Court has previously held in its forum non conveniens analysis that the alternative forum is inadequate, the Court also DENIES Defendant's motion to dismiss on the basis of international comity. While the United States and Colombia have strong interests in this case, the Court cannot dismiss Plaintiffs' case without the knowledge that Plaintiffs have

an alternative forum in which they are able to obtain a remedy.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion to Dismiss.

IT IS SO ORDERED.